Dirk **EPPERSON** and Betty Schneider, Plaintiffs,

v.

**ENTERTAINMENT EXPRESS, INC.,** n/k/a Advantix, Inc.; Irvin Richter, Hill International, Inc.; Hill Arts & Entertainment Systems, Inc., n/k/a Haesi Software, Inc.; Defendants.

No. 3:99 CV 778(DJS).

United States District Court, D. Connecticut.

Sept. 24, 2004.

Robert J. Sullivan, Jr., Westport, CT, for Plaintiffs.

Carolyn W. Kone, David R. Schaefer, Brenner, Saltzman & Wallman, New Haven, CT, for Defendants.

### MEMORANDUM OF DECISION

SQUATRITO, District Judge.

Plaintiffs Dirk Epperson and Betty Schneider have brought the above-captioned action against Entertainment Express, Inc., n/k/a Advantix, Inc.; Irvin Richter; Hill International, Inc.; and Hill Arts & Entertainment Systems, Inc., n/k/a HAESI Software, Inc. pursuant to Connecticut's enactment of the Uniform Fraudulent Transfer Act ("UFTA"), Conn. Gen.Stat. §§ 52–552a–5521 (West Supp.

2002). Now pending is Richter's motion to dismiss the claims against him for want of personal jurisdiction (dkt.# 35), defendants' motion for summary judgment (dkt.# 37), and plaintiffs' motion for summary judgment (dkt.# 68). For the reasons set forth herein, Richter's motion is **DENIED,** defendants' motion for summary judgment is **GRANTED,** and plaintiffs' motion for summary judgment is **DENIED.**

### I. THE PARTIES

Before engaging in the following prolonged recital of the procedural background and facts necessary decide the pending motions, a brief summary of the parties and claims is provided. Epperson and Schneider, initially as shareholders of Performing Arts Technology, Inc. ("PAT"), entered into a contract to develop computer software for Artsoft, Inc. ("Artsoft") in 1988. Before the contract was completed, PAT dissolved and Epperson and Schneider assumed the obligations under the contract.

Irvin Richter was, at the time of the events giving rise to this lawsuit, the Chairman and CEO of Hill International, Inc. ("Hill"). Hill is an international construction consulting and management firm located in New Jersey. Richter owned 66.7% of Hill's stock, and Richter's sons owned the remainder of the stock in Hill.

In 1987, Richter and Hill acquired a majority interest in Artsoft, which became known as Hill Arts & Entertainment Systems, Inc. ("Hill A & E") in 1990. Richter became the sole shareholder of Hill A & E on May 27, 1992. Hill loaned Hill A & E about $12 million, and became a secured creditor of Hill A & E. On May 31, 1996, Hill A & E sold substantially all its assets to Entertainment Express, Inc. ("EE"). Also, on May 31, 1996, Hill A & E changed

its name to HAESI Software, Inc. ("HAE-SI"). Richter, individually and through another entity he owned and controlled, held a substantial amount of EE stock during the time of the sale. Hill, as Hill A & E's secured creditor, took possession of the proceeds of the asset sale to EE, which later became known as Advantix, Inc. and then Tickets.com.

On April 23, 1997, following HAESI's sale of assets to EE, Epperson and Schneider obtained a judgment against Hill A & E and HAESI based upon a breach of the software development contract. Epperson and Schneider have been unable to procure satisfaction of this judgment from HAESI, and now seek to void HAESI's transfer of assets to EE as a fraudulent transfer, and also to void certain liens granted by HAESI to Richter and Hill as fraudulent.

## II. BACKGROUND

The above-captioned lawsuit is one of three lawsuits, two of which remain pending on the undersigned's docket (*Epperson v. Entertainment Express, Inc.*, No. 3:99CV778(DJS) (D.Conn.) and *Epperson v. Richter*, 3:01CV1798(DJS) (D.Conn.)) relating to monies due pursuant to a contract entered into in 1988 between plaintiffs and Artsoft, defendant HAESI's predecessor in interest. This court entered a default judgment against Hill A & E and HAESI in the amount of $422,446.00, plus post-judgment interest, in *Dirk Epperson and Betty Schneider v. Hill Arts & Entertainment Systems, Inc.*, No. 3:95CV2131(DJS) (D.Conn.) on April 23, 1997. The two active cases pending on the undersigned's docket are efforts by plaintiffs to collect this default judgment from other persons and entities. Several motions are now pending in these two remaining cases. A summary of the litigation between these parties to date follows.

On October 4, 1995, Dirk Epperson and Betty Schneider (collectively "plaintiffs") filed a lawsuit ("the First Action") against Hill A & E seeking damages for breach of a software development contract. Plaintiffs were the sole shareholders of PAT, which was a California corporation in the business of developing and marketing ticketing software for the performing arts industry. On August 2, 1988, PAT entered into a contract with Artsoft, which was a Delaware corporation with its principal place of business in Connecticut engaged in the same business. The contract provided that PAT would develop software products for Artsoft to either use for its own purposes or sell to others. Further, Artsoft was to pay royalties, in an amount not to exceed $250,000.00, to PAT on products developed pursuant to the contract and sold during a three-year period following the date of the first delivery of the software. In 1990, Hill A & E became Artsoft's successor in interest. Plaintiffs alleged that, despite the fact that PAT had performed its obligations under the contract, and that the maximum amount of royalties of $250,000.00 was due and owing, Hill A & E had not tendered full payment. After demands for payment, the first of which was dated December 20, 1991, plaintiffs filed suit in 1995.

Shortly after plaintiffs filed the First Action, Hill A & E underwent significant changes that altered the course of this litigation. On May 31, 1996, Hill A & E changed its name to HAESI, sold substantially all of its assets to EE, and received a convertible note from EE as payment. According to the Secretary of HAESI at that time, David Richter, HAESI pledged the convertible note and any other remaining assets to Hill, which was a secured creditor with an interest far in excess of the value of HAESI's assets. Following this corporate activity, HAESI's counsel

withdrew from the case, and HAESI took the position that it would not hire replacement counsel, as required for a corporation by the Local Rules for the District of Connecticut.

As a result, HAESI did not meet its obligations as a corporate litigant in this court. On February 3, 1997 plaintiffs moved for the entry of default against Hill A & E and HAESI for failure to obtain replacement counsel, failure to respond to discovery requests per order of this court, and failure to appear at a hearing on plaintiffs' application for a prejudgment remedy. The court granted this motion by endorsement on February 11, 1997. The court also granted plaintiffs' motion for judgment on April 3, 1997, and, on April 23, 1997 entered a default judgment against Hill A & E n/k/a/ HAESI in favor of plaintiffs in the amount of $422,446.00, with post-judgment interest to accrue at the statutory rate.

In light of HAESI's apparently compromised financial status, plaintiffs looked to alternate sources to satisfy the default judgment. On March 12, 1997, plaintiffs amended their original complaint in the First Action to add Advantix, which became the successor in interest to EE, along with Hill and Richter as defendants. Plaintiffs asserted two new causes of action: the first alleged that Hill and Richter were liable for the amount of the default judgment because they were the alter-ego of HAESI; and the second alleged that HAESI fraudulently conveyed assets to Advantix.[1] On March 23, 1998, this court dismissed plaintiffs' amended complaint against the new defendants for lack of subject matter jurisdiction. Specifically, the court concluded that both the plaintiffs and Advantix were citizens of California at the time the amended complaint was filed,

and, therefore, the action lacked complete diversity of citizenship. Further, the Court concluded that the plaintiffs failed to meet their burden of establishing that Advantix should not be considered a citizen of California because it was the alter-ego of Richter.

On April 27, 1999, the plaintiff filed the action bearing the docket number 3:99CV778(DJS) ("the Second Action") asserting two counts: first, alleging that, on May 31, 1996, Hill A & E fraudulently conveyed its assets to EE; and, second, that Hill A & E fraudulently granted liens in its property to Richter and Hill. In the Second Action, plaintiffs seek an order voiding Hill A & E's transfer to EE, thereby allowing them to execute their judgment against HAESI f/k/a Hill A & E. Plaintiffs argued that the court had subject matter jurisdiction over this claim pursuant to the court's inherent authority to preserve the integrity of its own judgments, complete diversity notwithstanding. By decision dated March 23, 1998, the court, relying upon *Peacock v. Thomas*, 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996), held that there was no independent jurisdictional basis to hold defendants against whom judgment had not been entered liable for the default judgment against HAESI f/k/a Hill A & E, and dismissed the case. On March 7, 2001, the Court of Appeals for the Second Circuit reversed the court's dismissal and remanded the Second Action to the undersigned's docket. The Court of Appeals held that, as distinguished from alter ego cases specifically addressed in *Peacock*, "fraudulent conveyance actions operate as simple collection mechanisms; they do not present a substantive theory seeking to establish liability on the part of a new party not otherwise liable," and, therefore, no indepen-

---

**1.** The amended complaint re-asserted the original two counts against HAESI. The April 23, 1997 default judgment was entered upon these counts.

dent basis for subject matter jurisdiction over plaintiffs' claims against the new defendants was necessary. *Epperson v. Entertainment Express, Inc.*, 242 F.3d 100, 108 (2d Cir.2001).

On June 30, 1999, plaintiffs filed a lawsuit ("the Third Action") in the United States District Court for the District of New Jersey against Richter, Hill, and Hill A & E n/k/a HAESI. The complaint in the Third Action alleged that Richter and Hill were liable for the default judgment against Hill A & E and HAESI on the theory that HAESI is the alter ego of Richter, Hill, or both Richter and Hill. Because plaintiffs did not name Advantix as a defendant, diversity was complete, thus avoiding the jurisdictional questions encountered in the Second Action caused by relying upon the court's supplemental enforcement jurisdiction. Defendants moved to dismiss the Third Action or, in the alternative, to stay the Third Action pending resolution of the Second Action. Defendants argued that an important issue asserted by plaintiffs as evidence that HAESI's corporate veil should be pierced to get to Hill and Richter in the Third Action was whether the interests granted by HAESI to Advantix, Richter, and Hill were fraudulent, and that this question would have to be adjudicated in the Second Action. Because the Second Action was the first filed, defendants requested a dismissal or the entry of a stay of the Third Action.

On July 17, 2001, the Honorable Stanley S. Brotman, United States District Judge, heard argument on defendants' motion to dismiss, and suggested that transferring the Third Action to the District of Connecticut may be appropriate. The next day, defendants consented to a transfer of the Third Action to the District of Connecticut, which Judge Brotman ordered on

September 17, 2001 pursuant to 28 U.S.C. § 1404(a).

Now that the Second and Third Actions have been pending on the undersigned's docket, several dispositive motions have been filed. In the Second Action, Richter's motion to dismiss (dkt. # 35, filed on September 6, 2001), defendants' motion for summary judgment (dkt. # 37, filed on October 5, 2001), and plaintiffs' cross-motion for summary judgment (dkt. # 68, filed on January 7, 2002) are pending. In the Third Action, defendants' motion for summary judgment (dkt. # 52, filed on May 3, 2002) and plaintiffs' cross-motion for summary judgment (dkt. # 59, filed on May 14, 2002) are pending.

### III. PENDING MOTIONS

As previously indicated, Richter's motion to dismiss (dkt.# 35), defendants' motion for summary judgment (dkt.# 37), and plaintiffs' cross-motion for summary judgment (dkt.# 68) are pending in this Second Action. Each is discussed below in turn.

### A. RICHTER'S MOTION TO DISMISS

█ Richter argues that the claims against him should be dismissed because this court may not acquire personal jurisdiction over him. The court finds that Richter has forfeited this defense.

Proceedings in the Third Action in the District of New Jersey mandate this result: On September 17, 2001, Judge Brotman entered an order transferring the Third Action to the District of Connecticut and specifically premised his order on the fact that "[c]ounsel [ ] consented to such a transfer...." (*Epperson v. Richter*, No. 99-3053(SSB), Consent Order to Transfer Pursuant to 28 U.S.C. § 1404(a) (D.N.J. Sept. 17, 2001); renumbered 3:01CV1798(DJS) (D.Conn.)). The Supreme Court has interpreted the language set forth in 28 U.S.C. § 1404(a), the stat-

ute from which Judge Brotman drew his authority to transfer the matter to the District of Connecticut on the basis of convenience, to require that both venue and personal jurisdiction over each defendant be proper in the transferee district as a prerequisite to a transfer. *See Hoffman v. Blaski,* 363 U.S. 335, 341 & 344, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960), *see also Cali v. East Coast Aviation Services, Ltd.,* 178 F.Supp.2d 276, 282–83 (E.D.N.Y.2001). Therefore, Judge Brotman has specifically found that Richter consented to venue and personal jurisdiction in the District of Connecticut and has implicitly found that there was personal jurisdiction over Richter in the District of Connecticut at the time the Third Action was filed. *See Hoffman,* 363 U.S. at 343–44, 80 S.Ct. 1084 (holding that consent is immaterial to determining whether the prerequisites to applying § 1404(a) have been satisfied).

 Regardless of whether Judge Brotman's implicit finding in the Third Action that there was personal jurisdiction over Richter in the District of Connecticut controls the result in this case, the court finds that Richter, through his conduct in the District of New Jersey before Judge Brotman, has forfeited his personal jurisdiction defense in this case. In this situation, a forfeiture is "the failure to make a timely assertion of a right. . . ." *Hamilton v. Atlas Turner, Inc.,* 197 F.3d 58, 61 (2d Cir.1999). When considering whether a defendant has forfeited the defense of lack of personal jurisdiction, despite that defendant's technical compliance with Rule 12(h) of the Federal Rules of Civil Procedure, the court examines "all of the relevant circumstances." *Hamilton,* 197 F.3d at 61. An objecting party's request that the court take action in its favor, without contemporaneously asserting the personal jurisdiction defense, may result in a forfeiture of the defense. *See Hamilton,* 197

F.3d at 61 (reversing district court's grant of motion to dismiss for lack of personal jurisdiction because defendant had forfeited the defense based, in part, upon defendant's request to transfer the case to the Judicial Panel for Multidistrict Litigation without moving to dismiss for lack of personal jurisdiction); *Lomaglio Associates, Inc. v. LBK Marketing Corp.,* 876 F.Supp. 41, 43 (S.D.N.Y.1995) ("If a party requests that the court exercise its power on that party's behalf, and the request is not preceded or accompanied by an objection to personal jurisdiction, that party is deemed to have waived its defense of lack of personal jurisdiction."); *cf. Grammenos v. Lemos,* 457 F.2d 1067, 1070 (2d Cir.1972) ("If a party enters a case, makes no objection to jurisdiction, and asks the court to act on its behalf in some substantive way, it will be held to have waived further objection.").

Richter has forfeited his personal jurisdiction defense consenting to a transfer of the Third Action to Connecticut for the sake of convenience without informing the court of his intention to assert a lack of personal jurisdiction in Connecticut. The record of the proceedings before Judge Brotman reveals that Richter requested a transfer under the "first filed rule" and eventually consented to transferring the Third Action to Connecticut without informing Judge Brotman that he had a pending objection to personal jurisdiction in Connecticut. Richter has thus placed this court in a difficult predicament: the Second Action was transferred from New Jersey to Connecticut so that it may be heard with the Third Action in the interest of convenience. In the Second Action, which was originally filed in Connecticut, Richter contests personal jurisdiction. If the slate were clean, and Richter's personal jurisdiction defense was well founded, one viable option for this court to consider would be to transfer the Second Action to

New Jersey, where Richter would have no personal jurisdiction objection, so that plaintiffs' claims could be decided on the merits. On the flip side of the coin, had he been fully apprised of the situation, Judge Brotman presumably would have had misgivings about transferring the Third Action to Connecticut at Richter's request when Richter had raised a personal jurisdiction defense before this Connecticut court in the Second Action. To re-examine the propriety of Connecticut as a forum at this stage of the litigation as a whole would be to countenance an expensive and intolerable jurisdictional carousel.

Although the defense of personal jurisdiction is an important right, derived from the Due Process Clauses of the Fifth and Fourteenth Amendments, Richter's failure to disclose his objection in the Second Action to Judge Brotman while Judge Brotman was considering Richter's request to transfer the Third Action to Connecticut constitutes a forfeiture of this defense. Once Richter made use of the judicial process to transfer the Third Action to Connecticut, he forfeited his right to contest the validity of Connecticut as a forum in the litigation as a whole. Richter's motion to dismiss must therefore be denied.

## B. CROSS MOTIONS FOR SUMMARY JUDGMENT

Both parties have filed motions for summary judgment. for the reasons set forth herein, defendants' motion is **GRANTED** and plaintiff's motion is **DENIED.**

### 1. FACTS

Rule 9(c) of the Local Rules of Civil Procedure for the District of Connecticut (now Rule 56) sets forth a procedure to aid the court in identifying factual disputes in motions for summary judgment. What follows are the undisputed facts set forth in the parties' submissions,[2] as well as those facts to which the non-moving party with respect to each motion has not offered any evidence in opposition.[3]

This lawsuit has its genesis in a business deal between two competing companies in 1988. The first company was Artsoft, Inc. ("Artsoft"). Artsoft was founded by Lawrence Schwartz in 1984 and incorporated in the State of Connecticut. Artsoft maintained its principal place of business in Guilford, Connecticut and developed, installed, and serviced ticketing software used at entertainment and sports venues. On August 7, 1987, Irvin Richter (36 shares), Hill International, Inc.[4] ("Hill") (48 shares), and William J. Doyle (13 shares), who was the President of Hill, became the owners of Artsoft. On February 27, 1990, a Delaware corporation also named Artsoft purchased all of the shares of the Connecticut Artsoft and became the successor in interest to the Connecticut Artsoft. Richter (390 shares), Hill (480 shares), and Doyle (130 shares) owned the Delaware Artsoft, which was incorporated on June 30, 1987. Upon purchasing the Connecticut Artsoft, the Delaware Artsoft changed its name to Hill Arts & Entertainment Systems, Inc. ("Hill A & E"). On

---

**2.** The court does not reject any affidavits filed in support of the pending motions, and notes the parties arguments in support thereof in assigning weight to the statements set forth in the challenged affidavits.

**3.** The court takes judicial notice of the record in the Third Action.

**4.** In 2001, Richter owned 66.7% of Hill's shares of stock. At all pertinent times, Richter exercised control over Hill's affairs. (*See Epperson v. Entertainment Express, Inc.,* No. 3:99CV778(DJS), Dkt. # 71, § A., ¶ 6).

May 27, 1992, Richter became the sole owner of Hill A & E.[5]

The second party to the aforementioned business deal was Performing Arts Technology, Inc. ("PAT"). Plaintiffs were the sole shareholders of PAT, which was a California corporation in the business of developing and marketing ticketing software for the performing arts industry.

On August 2, 1988, PAT entered into a contract with Artsoft, which provided that PAT would develop software products that Artsoft would then either use for its own purposes or sell to others. Specifically, under the contract, PAT would "port" specified Artsoft software to function in a new operating environment and "design and develop a new generation of software to replace or supplement some of Artsoft's Existing Software." (*Epperson v. Entertainment Express, Inc.*, No. 3:99CV778(DJS), Dkt. # 67, Ex. B, Ex. A at 1). With respect to the second undertaking set forth in the contract, the parties stated the following: "PAT and Artsoft will work together to design and develop this new and advanced version of Artsoft's Existing Software under the direction and control of Artsoft." (*Id.*, Ex. B, Ex. A, ¶ 3.1 at 4). The contract provided that Artsoft would own all intellectual property rights to any new program developed pursuant to the contract, and that the development of the new program was for the sole benefit of Artsoft. Compensation to PAT for services rendered with respect to the development of new software was in the form of a monthly fee and royalties, in an amount not to exceed $250,000.00, to PAT

from the sale of new software products sold during a three-year time period following the date of the first delivery of the new software. The contract provided that, in the event Artsoft defaulted on the royalty payments, Artsoft would forfeit the "right to use or market any New Program containing any PAT work product." [6] (*Id.*, Ex. B, Ex. A, ¶ 14.6 at 14).

Artsoft and PAT also entered into additional business arrangements. Pursuant to the terms of the August 2, 1988 contract, Epperson became Artsoft's Vice President of Development by separate contract dated April 1, 1989. Epperson remained an employee of Artsoft and Hill A & E in this capacity until 1993.[7] Further, PAT and Artsoft entered into a Stock/Asset Purchase Agreement, dated August 7, 1988, whereby PAT granted Artsoft the option to purchase all of PAT's stock or all of PAT's assets related to specified lines of business upon payment of the maximum royalty fee under the August 2, 1988 contract. In April of 1990, PAT employees became Artsoft employees, and Artsoft assumed PAT's customers, support contracts, and assets.

With respect to the development of a marketable product, the business arrangement between Artsoft and PAT was successful. The new program referred to in the August 2, 1988 contract was in fact developed and named Artsoft/SQL and Sportsoft/SQL. Epperson claims that Artsoft and later HAESI successfully marketed this software for years, and that the rights to the software were transferred to EE on May 31, 1996.

---

5. Richter purchased Hill's shares of Hill A & E on July 1, 1991.

6. Plaintiffs did not invoke this remedy when they filed suit in this court on October 4, 1995. At all relevant times in the First Action, plaintiffs sought only unpaid sums due and owing.

7. Epperson testified that he left Hill A & E because Hill A & E was scaling back its software development, which was Epperson's primary area of expertise.

Once the software had been developed, however, payment under the contract was not tendered when due. Plaintiffs alleged that, despite the fact that PAT had performed its obligations under the contract, and that the maximum amount of royalties of $250,000.00 was due and owing, Hill A & E had not tendered full payment.[8] According to plaintiffs, Hill A & E had paid $76,250.00. Plaintiffs then sued Hill A & E on October 4, 1995 in this court for the unpaid balance, late fees, costs, and attorneys' fees, and this court entered a default judgment against Hill A & E in the amount of $422,446.00 on April 23, 1997.

Even though plaintiffs had obtained a default judgment against Hill A & E and HAESI, they were unable to recover the amount of the judgment because, through a series of corporate transactions, HAESI did not have the assets to satisfy plaintiffs' judgment. Three entities owned or controlled by Richter were involved in the transactions that left HAESI f/k/a Hill A & E unable to satisfy plaintiffs' default judgment: HAESI; Hill; and Entertainment Express, Inc. ("EE").

The first entity was HAESI. As stated previously, as of May 27, 1992, Richter was the sole shareholder of Hill A & E. As of May 31, 1996, Richter was also the sole director of Hill A & E. Lawrence Schwartz was the President of Hill A & E, James Cassano was the Vice Chairman, David Richter was the Secretary, and Stanley Gloss was the Controller.

The second entity was Hill. Hill is a professional services firm in the business of providing construction consulting and construction management services to governmental entities, institutions, and the private sector. As of 2001, Richter owned

66.7% of Hill, and, at all times pertinent to this lawsuit, Richter controlled Hill. Richter was also the Chairman, CEO, and Director of Hill. James Cassano was the Senior Vice President of Hill.

The third entity was EE. Prior to May 28, 1996, Richter owned 4.5 million shares of EE stock, and Schwartz and James Cassano each owned 1 million shares of EE stock. As of May 28, 1996, EE repurchased all of its outstanding stock and sold 80% of its stock to R4 holdings, of which Richter owns an interest not specified in the record, and 10% each to both Cassano and Schwartz. On May 31, 1996, EE's corporate leadership was as follows: Richter, Director; Cassano, Chairman, CEO, and Director; Lawrence Schwartz, President and Director; and David Richter, Vice President, General Counsel, and Secretary.

The first transaction affecting HAESI's ability to satisfy plaintiffs' default judgment was a loan from Richter to Hill A & E. On November 26, 1991, Hill A & E made a Promissory Note payable to Richter with the principal amount of $1,100,000.00. The note was payable on demand, with an interest rate at the prime rate as set by Commerce Bank, N.A. plus 1.5%. Also on November 26, 1991, Hill A & E executed a security agreement in all Hill A & E's personal property as collateral for the promissory note. UCC–1 financing statements with respect to Richter's security interest were filed in Connecticut on December 5, 1991, in New Jersey on December 10, 1991, and in California on October 24, 1994. The security agreement and the UCC–1 statements cited the following property as subject to the security interest granted to Richter:

---

**8.** On June 19, 1989, PAT and Artsoft entered into an Amendment to Custom Software Development Agreement. This amendment altered the fee schedule with respect to the development of the new software by eliminating the monthly fee and providing for a cash advance of $40,000.00 towards the payment of the maximum royalty fee.

all "Accounts," "Contracts," "Contract Rights," "Chattel Paper," "Instruments," "Documents," "General Intangibles," "Inventory," "Equipment," and "Fixtures," as each term is defined in the Uniform Commercial Code as enacted in the State of New Jersey, all deposits and bank accounts, all other personal property, tangible or intangible, all books and records relating to the foregoing, and all proceeds and products thereof and substitutions, additions, and accessions thereto, now existing or hereafter acquired, wherever located.

(*Epperson v. Entertainment Express, Inc.*, No. 3:99CV778(DJS), Richter Dec., Dkt. # 71, Ex. 4 at 1). Richter states that, as of April 30, 1996, the balance due on the note was $682,344.40.

The second transaction affecting HAE-SI's ability to satisfy plaintiffs' default judgment was a loan from Hill to Hill A & E. On April 1, 1994, Hill A & E and Hill entered into a Loan and Security Agreement. In this agreement, the parties stated the following: "[Hill A & E] has borrowed from [Hill] for several years on a line of credit. [Hill A & E] and [Hill] wish to renew this Line of Credit Loan in the amount of $12,000,000 for another five year period." (*Id.*, Ex. 7 at 1). The agreement further states that

[Hill] shall establish for [Hill A & E] a $12,000,000 line of credit ("Line of Credit Loan") pursuant to which advances have been made and, in [Hill's] discretion, additional advances for the payment of obligations of [Hill A & E] may be made by [Hill] and for payment of interest on this Line of Credit Loan may be made from time to time up to a maximum aggregate outstanding principal balance of Twelve Million ($12,000,000.00) Dollars. The Line of Credit Loan shall accrue at the rate of Seven (7%) per anum.

(*Id.*, Ex. 7 at 2). The agreement further provided that Hill would take a security interest in "collateral," which is defined as "all Accounts Receivable, Equipment, Inventory, Contract Rights and General Intangibles of Borrowers and Guaranty, all of the foregoing whether now owned or hereafter acquired" (*id.*, Ex. 7 at 2), "now owned or hereafter acquired by [Hill A & E] and all cash and non-cash proceeds thereof and proceeds of proceeds," (*id.*, Ex. 7 at 3). Hill A & E made a Replacement Line of Credit Note payable to Hill on April 1, 1994. UCC–1 statements with respect to Hill's security interest were filed in Connecticut on June 7, 1994, New Jersey on June 8, 1994, and California on October 18, 1994. Both statements set forth the following property as subject to the security interest:

All "Accounts", "Contracts", "Contract Rights", "Chattel Paper", "Instruments", "Documents", "General Intangibles", "Inventory", "Equipment", and "Fixtures" as each term is defined in the Uniform Commercial Code as enacted in the State of New Jersey, all deposits and bank accounts, all other personal property, tangible or intangible, all books and records relating to the foregoing and all proceeds and products thereof and substitutions, additions and accessions thereto, now existing or hereafter acquired, wherever located.

(*Id.*, Ex. 9 & 10).

Subsequent to Hill A & E and Hill's agreement, Richter recorded a subordination of his security interest to that of Hill. On September 8, 1994, Richter filed a UCC–3 Statement of Subordination in New Jersey, which certified that he had subordinated his security interest in Hill A & E's property to Hill's security interest. Richter's October 24, 1994 UCC–1 statement, which was filed in California, also indicated that Hill's interest was superior

to Richter's. On October 31, 1994, Richter filed a UCC–3 statement of subordination in Connecticut reflecting the same.

Hill A & E accounted for the loan from Hill in two different ways on Hill A & E's balance sheets. According to defendants, Hill A & E listed funds received from Hill as loans on Hill A & E's 1989, 1990, and 1991 balance sheets. According to defendants, however,

> [i]n 1992, because Hill A & E was seeking investors, and new investors will not agree to have their investments [ ] subordinated to secured debt, Richter considered requesting Hill to convert its debt to preferred stock. Hill A & E's balance sheets were changed to reflect what the balance sheets would have looked like had new investors been found. No new investors were found, and Hill did not convert its debt to preferred stock. In 1995, Arthur Anderson audited Hill A & E's financial statements and required that the Hill loans be listed on Hill A & E's balance sheets as a Note. Hill A & E issued new balance sheets for 1993, 1994, and 1995 listing the Hill loans as long term debt and Notes.

(*Epperson v. Entertainment Express, Inc.*, No. 3:99CV778(DJS), Dkt. # 71, Resp. to ¶ 110 at 22–23). During 1993 through 1995, Stanley Gloss classified the funds in question from Hill as "Debt to Parent Incurred" on Hill A & E's Cash Flow statements. (*See Epperson v. Entertainment Express, Inc.*, No. 3:99CV778(DJS), Dkt. # 75, ¶ 11 at 3). Whatever the reason therefor, it is undisputed that Hill A & E's 1993 through 1995 balance sheets classified funds received from Hill as capitali-

zation rather than a loan prior to being audited by Arthur Anderson in 1995.

The parties' submissions to the court in the Second and Third Actions chronicle the troubled financial condition of Hill A & E from roughly 1990 through 1996. The record indicates that Schwartz, the founder of Artsoft and President of Hill A & E, was in frequent correspondence with Richter, the sole director and shareholder of Artsoft, regarding Hill A & E's financial condition. Specifically, the parties have submitted a substantial amount of correspondence between Schwartz, Richter, and other officers of Hill A & E and Hill detailing, among other things, Hill A & E's cash flow problems, disagreements regarding the authorization of Hill A & E's expenditures, Hill A & E's requests for additional capital, disagreements regarding Schwartz's authority to enter into contracts on behalf of Hill A & E, resolving inter-company reimbursement issues between Hill A & E and Hill, keeping Hill A & E's creditors at bay, including some instances where the particular obligation at issue was guaranteed by Hill, and layoffs caused by Hill A & E's financial condition. The record also reveals that, towards the end of this time period, Hill A & E, Hill, and Richter were exploring new options regarding the future of Hill A & E.

The third transaction affecting HAESI's ability to satisfy plaintiffs' default judgment was Hill A & E's sale of its assets to EE. On May 31, 1996, Hill A & E sold substantially all of its assets [9] to EE, and changed its name to "HAESI". Payment was in the form of a convertible note to HAESI from EE in the amount of

---

9. A fairness evaluation, dated May 31, 1996 and conducted by Howard, Lawson & Co. at the request and for the benefit of Hill, valued Hill A & E's assets at $2.3 million as of April 30, 1996. (*See Epperson v. Entertainment Ex-*

*press, Inc.*, No. 3:99CV778(DJS), Sullivan Aff., Dkt. # 63, Ex. R at 1). As of April 30, 1996, according to the fairness opinion, Hill A & E's liabilities totaled $13.2 million. (*See id.*).

$3,000,000.00, with interest to accrue at a rate of 8% per year. The principal was due on May 31, 2001. Interest on the convertible note was to be paid annually on May 31 of each year, the first payment of which was to be paid in stock, and each payment thereafter in either stock or cash, at EE's discretion. The convertible note gave the holder the right to convert any amount of the principal balance thereof into EE common stock.

As HAESI's secured creditors, Hill and Richter took liens on the convertible note as proceeds from the asset sale. As of the date of the sale, Hill A & E owed Hill $8,402,909.18 in principal and $3,782,000.00 in interest pursuant to the April 1, 1994 Loan Security Agreement. Hill A & E also owed Richter $682,344.00 at this time, which was also secured. As a condition of the asset sale to EE, both Hill and Richter released their security interests on the assets transferred to EE, and substituted the convertible note, and any payments made thereunder, as collateral for their loans to HAESI. Hill and Richter subsequently filed UCC–1 statements in New Jersey listing the following collateral as subject to their respective security interests:

> Debtor's interest in the $3,000,000 Convertible Promissory Note ("Note") from entertainment Express, Inc. to Debtor dated May 31, 1996; all shares of stock hereafter acquired by Debtor as interest or upon conversion of the Note; all interest, dividends and distributions payable with respect to the foregoing (whether or not the same constitute general intangibles); and all proceeds of the foregoing.

(*Epperson v. Entertainment Express, Inc.*, No. 3:99CV778(DJS), Richter Dec., Dkt. # 41, Exs. 20 & 21). Hill, which is located in New Jersey, took possession of the convertible note following the asset sale, and payments under the convertible note were made to Hill. Hill then foreclosed on the note on November 11, 1996.

According to defendants, the purpose of selling HAESI's assets was to create a new entity with unencumbered assets so that an infusion of venture capital could be obtained and EE could enter into a ticket transaction business rather than strictly a software development and licensing business. In April of 1996, EE,[10] Hill A & E, and Ventana Global, Ltd. entered into an agreement whereby EE would acquire Hill A & E's assets, including the software developed pursuant to the August 2, 1988 contract between PAT and Artsoft. Further, pursuant to this agreement, Ventana would obtain venture capital for EE and assist in a reorganization of EE's corporate finance structure in order to facilitate an initial public offering. Thus, Richter and Hill effectively converted their interest in Hill A & E from secured debt to equity in a new entity.

## 2. STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in

---

**10.** EE was incorporated under the laws of the State of Delaware on January 29, 1995.

dispute.'" *American Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975)). A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

### 3. DISCUSSION

Plaintiffs assert claims under Connecticut's [11] enactment of the Uniform Fraudulent Transfer Act, Conn. Gen.Stat. §§ 52–552a–5521 (West Supp.2002).[12] In the First Cause of Action set forth in the Complaint, plaintiffs seek to set aside HAESI's May 31, 1996 sale of its assets to EE. In the Second Cause of Action, plaintiffs seek avoidance of the liens purportedly encumbering HAESI's, then known as Hill A & E, assets prior to the transfer to EE. For the reasons set forth herein, defendants are entitled to judgment as a matter of law on both causes of action because the property transferred to EE did not consist of "assets" as that term is defined in UFTA, and plaintiffs may not challenge the validity of the security interests in the property transferred to EE, or

received from EE as proceeds, under the governing statute of repose.

### a. UFTA Definition of "Asset"

 Defendants argue that plaintiffs cannot prevail on their claim to set aside HAESI's May 31, 1996 transfer of its assets to EE. Because plaintiffs' claim arose prior to the challenged transfer, the following are considered fraudulent transfers pursuant to the UFTA:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due[,]

Conn. Gen.Stat. § 52–552e(a); and

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the

---

**11.** Defendant argues that Connecticut law applies to plaintiffs' claims. Plaintiffs have not taken a position on this issue. Based upon defendants' arguments, the court finds that Connecticut law applies to plaintiffs' claims.

**12.** UFTA applies to all transactions occurring after October 1, 1991, the date of its enactment in Connecticut. *See Dietter v. Dietter,* 54 Conn.App. 481, 486–87, 737 A.2d 926 (1999).

debtor became insolvent as a result of the transfer or obligation[,] Conn. Gen.Stat. § 52–552f(a). The party who seeks to set aside the transaction bears the burden of proving, by clear and convincing evidence, that the transaction was fraudulent. *See Dietter v. Dietter,* 54 Conn.App. 481, 488, 737 A.2d 926 (1999); *Tessitore v. Tessitore,* 31 Conn.App. 40, 42, 623 A.2d 496 (1993).

■ The UFTA gives the court broad authority to remedy fraud. "A grantor has an interest in property fraudulently conveyed which may be reached by attachment." *Olin Corp. v. Castells,* 180 Conn. 49, 52, 428 A.2d 319 (1980). In an action alleging a fraudulent transfer, the creditor may pursue the following remedies:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim; (2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by chapter 903a; (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property, (B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee, or (C) any other relief the circumstances may require.

Conn. Gen.Stat. § 52–552h (footnote omitted).

Because Hill A & E's property, and any property transferred to HAESI on May 31, 1996, specifically the convertible note, was encumbered by security interests that exceeded the value of the property, plaintiffs may not pursue a remedy under UFTA. A "transfer" is defined under the UFTA as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." Conn. Gen.Stat. § 52–552b(12). The UFTA defines the term "asset" as

property of a debtor, but the term does not include: (A) Property to the extent it is encumbered by a valid lien, (B) property to the extent it is generally exempt under nonbankruptcy law, or (C) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.

Conn. Gen.Stat. § 52–552b(2). Further, a "lien" is "a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common law lien or a statutory lien," Conn. Gen.Stat. § 52–552b(8), and a "valid lien" is "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings," Conn. Gen.Stat. § 52–552b(13). Therefore, if there is a "valid lien" on property that exceeds the value of the property, the property cannot be considered an "asset," and there can be no "transfer" under the UFTA.

Hill and Richter had perfected security interests well in excess of the value of both Hill A & E's property and the convertible note payable to HAESI, which was substituted as collateral after Hill A & E transferred its assets to EE. These security interests are "valid liens" that exceeded the value of the collateral, thereby precluding either Hill A & E's property or the convertible note from meeting UFTA's definition of "asset." As such, the May 31, 1996 sale cannot, as a matter of law, be

considered a "transfer" subject to UFTA. *See Dietter,* 54 Conn.App. at 494, 737 A.2d 926.

Plaintiffs have failed to produce any evidence to refute defendants' claim that the property sought in the complaint is an "asset" under UFTA. Instead, they dispute, in conclusory fashion, the validity of the supporting documentation regarding Hill's and Richter's liens. Because plaintiffs cannot, as a matter of law, meet their evidentiary burden, judgment must enter in favor of the defendants on this claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 333 n. 3, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J. dissenting)("Once the moving party has attacked whatever record evidence—if any—the nonmoving party purports to rely upon, the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)."); *see generally* 11 Moore's Federal Practice § 56.11(7)(c) (Matthew Bender 3d ed. 1997) ("Just as woefully weak fact disputes do not preclude summary judgment, mere assertions can not preclude summary judgment since assertions have less probative value than facts.").

#### b. Statute of Repose

█ Having failed to offer sufficient evidence that Hill's and Richter's liens did not actually exist, plaintiffs further contend that the court should find that Hill's and Richter's liens were unenforceable and therefore were not "valid liens," which would allow plaintiffs to demonstrate that the property transferred to HAESI from EE was an "asset."[13] Specifically, plaintiffs argue that Hill A & E's granting of security interests to Hill and Richter in its property were fraudulent transfers. In support of this argument, plaintiffs cite the fact that Hill and Richter directed Hill A & E to reclassify the $8 million loaned to Hill A & E as capital, only to later direct that Hill A & E again reclassify the $8 million as debt, purportedly to thwart plaintiffs' collection efforts.

Defendants claim that plaintiffs cannot bring a cause of action to attack the security interests in Hill A & E's property granted to Hill and Richter in 1994 because any such action is barred by UFTA's statute of repose. Section 52–552j of the Connecticut General Statutes provides the following:

> A cause of action with respect to a fraudulent transfer or obligation under sections 52–552a to 52–5521, inclusive, is extinguished unless action is brought: (1) Under subdivision (1) of subsection (a) of section 52–552e, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant; (2) under subdivision (2) of subsection (a) of section 52–552e or subsection (a) of section 52–552f, within four years after the transfer was made or the obligation was incurred; or (3) under subsection (b) of section 52–552f, within one year after the transfer was made or the obligation was incurred.

Conn. Gen.Stat. § 52–552j. This statute of repose sets forth different time bars applicable to different types of claims. First, in claims alleging constructive fraud, a claim

---

**13.** Plaintiffs argument that Richter's and Hill's security interests are simply void is not persuasive. Plaintiffs have not cited any persuasive authority indicating that the court should deem Richter's and Hill's security interests null and void.

must be brought within four years of the date of the transfer. *See* Conn. Gen.Stat. § 52–552j(2). Second, in a case where there has been "actual intent to hinder, delay or defraud any creditor of the debtor," Conn. Gen.Stat. § 52–552e(a)(1), a cause of action must be brought either within four years from the date of transfer or within one year from the date the transfer "could reasonably have been discovered by the claimant." Conn. Gen.Stat. § 52–552j(1). Third, a cause of action alleging a preferential transfer must be brought within one year of the transfer. *See* Conn. Gen.Stat. § 52–552j(3).

Because plaintiffs allege actual fraud, (*see* Compl., ¶ 9(a)), subsection (3) applies to their claims. Hill A & E granted Richter a security interest in substantially all of its property on November 26, 1991 and Hill a security interest in the same property on April 1, 1994. Plaintiffs commenced this lawsuit on April 27, 1999, thereby exceeding the permissible time period to challenge the validity of the security interests. Further, plaintiffs cannot avail themselves of the provision granting an additional one year from the time when they should have been able to learn of the granting of the security interests. Hill's and Richter's security interests in Hill A & E's property were perfected by filing UCC–1 statements, which are public records, the last of which pertaining to Hill A & E's property was filed on October 31, 1994.[14] Hill A & E has been the target of plaintiffs' litigation from the time the First Action was filed in 1995. The existence of security interests in property that may be used to satisfy a judgment against Hill A & E was a matter of public record since at least October 31, 1994. Therefore, plaintiffs could not, as a matter of law, have

been prevented from discovering the existence of the security interests.

### c. Fraudulent Concealment

 Plaintiffs cannot, as a matter of law, prevail on their claim that defendants fraudulently concealed the existence of a cause of action against defendants. Plaintiffs seek the protection provided by Section 52–595 of the Connecticut General Statutes, which provides the following:

> If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence.

Conn. Gen.Stat. § 52–595. In order to prove fraudulent concealment, the party asserting the claim must demonstrate the following:

> (1) a defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2) that defendant's intentional concealment of these facts from the plaintiffs; and (3) that defendant's concealment of the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action.

*Bartone v. Robert L. Day Co., Inc.*, 232 Conn. 527, 533, 656 A.2d 221 (1995). Plaintiffs must prove these elements by clear and convincing evidence. *See Fichera v. Mine Hill Corp.*, 207 Conn. 204, 215, 541 A.2d 472 (1988).

Defendants contend that, because Section 52–552j is a statute of repose, Section 52–595 does not apply to toll the limitation period. "The effect of the statute of re-

---

14. The original security interest in Hill A & E's property covered proceeds from the sale of the property, and therefore covered the

convertible note. As such, the date of perfecting any security interest granted specifically in the convertible note is of no moment.

pose is that, on occasion, a party's cause of action will be barred even before the action began to accrue." *Daily v. New Britain Mach. Co.*, 200 Conn. 562, 582, 512 A.2d 893 (1986). The Connecticut Supreme Court has stated the following:

> Undoubtedly, statutes of repose differ in some respects from statutes of limitation. "While statutes of limitation are sometimes called 'statutes of repose,' the former bars right of action unless it is filed within a specified period of time after injury occurs, while 'statute[s] of repose' [terminate] any right of action after a specific time has elapsed, regardless of whether there has as yet been an injury." Black's Law Dictionary (6th Ed.1990) p. 927 . . . .

*Baxter v. Sturm, Ruger and Co., Inc.*, 230 Conn. 335, 341, 644 A.2d 1297 (1994) (alterations in original). Because Section 52–595 speaks in terms of the accrual of a cause of action, which is immaterial to a statute of repose, defendants contend that Section 52–595 may not be used to toll the time period for filing a claim under Section 52–552j.

Given the Connecticut Supreme Court's reluctance to draw a distinction between statutes of repose and statutes of limitation expressed in *Baxter,* and its mandate to broadly apply Section 52–595, the court finds that plaintiffs may request the relief afforded by Section 52–595 despite the fact that Section 52–552j is a statute of repose. In *Baxter,* the Connecticut Supreme Court declined to definitively distinguish between statutes of repose and statutes of limitations for the purpose of determining whether a statute of repose should be treated as a "substantive" provision of law rather than "procedural". *See id.* at 344–45, 644 A.2d 1297 ("In our view, the fact that a statute of repose may bar a claim before the cause of action has accrued does not form a basis to distinguish it from a

statute of limitation for choice of law purposes."). Further, the Connecticut Supreme Court has held that "the exception contained in § 52–595 constitutes a clear and unambiguous general exception to any statute of limitations that does not specifically preclude its application." *Connell v. Colwell,* 214 Conn. 242, 246 n. 4, 571 A.2d 116 (1990). In *Connell,* the Connecticut Supreme Court held that Section 52–595 applied to the statute of repose portion of Section 52–584, and rejected an argument similar to that advanced by defendants. *See id.* When considered together, these two holdings indicate that the Connecticut Supreme Court would not draw the distinction suggested by defendants, and this court declines to do so here.

▇ Defendants also contend that plaintiffs cannot meet their burden of proving fraudulent concealment. Because defendants could not, as a matter of law, have concealed the existence of the security interests in favor of Hill and Richter in light of the UCC–1 filings, defendants are entitled to judgment as a matter of law on plaintiffs' fraudulent concealment claim. Plaintiffs contend that they could not have discovered the existence of a cause of action until Hill A & E produced information regarding the reclassification of Hill's infusion of capital into Hill A & E to that of a loan from Hill to Hill A & E, which is referenced in the April 1, 1994 Loan and Security Agreement entered into between Hill and Hill A & E. Plaintiffs argue that defendants fraudulently concealed this information by posing an improper objection to plaintiffs' discovery requests served on March 22, 1996 and failing to respond to plaintiffs post-judgment interrogatories served on March 19, 1998.

Plaintiffs' position is untenable. Plaintiffs' purport to state a cause of action setting aside Hill's and Richter's security interests in Hill A & E's property. The

"cause of such action", as referred to in Section 52–595 as that which must be concealed, is therefore the grants of the security interests. Richter's security interest was granted on November 26, 1991 while Hill's security interest was granted on April 1, 1994. As previously discussed herein, Richter's and Hill's security interests in Hill A & E's property were perfected by filing UCC–1 statements, which are public records, in Connecticut on December 5, 1991 and June 7, 1994, respectively. Hill A & E's grants of security interests to Hill and Richter are the events that trigger the statute of repose, and are the events that defendants must have concealed in order for plaintiffs to prevail. Because of the public filings memorializing these transactions, defendants could not have concealed the existence of the security interests from plaintiffs. Were the court to hold otherwise, the emphasis, for the purpose of applying Section 52–595, would be placed inappropriately upon discovery of the evidence in support of a claim that a transfer was fraudulent and not of the transfer itself, which is the event that triggers the four-year repose period set forth in Section 52–552j.

Further, plaintiffs' claim to have discovered the "cause of such action" in March of 2001 is not credible because plaintiffs filed the instant action challenging the validity of the Hill and Richter security interests on April 27, 1999. If plaintiffs could have filed an action on April 27, 1999 without the benefit of the information discovered in March of 2001, there is no reason why plaintiffs could not have filed an action within the limitation period, which expired on April 1, 1998, or almost one full year after plaintiffs obtained a default judgment against Hill A & E. Plaintiffs' filing this action two years before allegedly discovering the "cause of [plaintiffs'] action" belies the importance of the evidence discovered in March of 2001, and supports the conclusion that the "cause of such action" was the grant of Hill's and Richter's security interests.

Because the "cause of [plaintiffs'] action" was, as of October 31, 1994, a matter of public record, defendants could not have concealed the "cause of [plaintiffs'] action" from plaintiffs. Therefore, plaintiffs cannot, as a matter of law, meet their burden of proving fraudulent concealment pursuant to Section 52–595, and there is no basis to toll the statute of repose applicable to plaintiffs' claims.[15]

## IV. CONCLUSION

For the reasons set forth herein, defendants are entitled to judgment as a matter of law with respect to both of plaintiffs' claims. Because the property plaintiffs claim Hill A & E fraudulently transferred was encumbered by liens exceeding the value of the property, the property is not an "asset," and the transfer cannot be challenged under the UFTA. In addition, plaintiffs cannot challenge the validity of the liens on the subject property because their claims are barred by the applicable statute of repose. Richter's motion to dismiss (dkt.# 35) is **DENIED**; defendants' motion for summary judgment (dkt.# 37) is **GRANTED**; and plaintiffs' motion for summary judgment (dkt.# 68) is **DENIED**. Judgment shall enter in favor of the defendants on all counts forthwith. The Clerk of the Court shall close this file.

---

**15.** Plaintiffs have not met their burden of proving that defendants are estopped from claiming that Richter's and Hill's security interests are not valid.