NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2014-0465


CELESTICA, LLC

v.

COMMUNICATIONS ACQUISITIONS CORPORATION

Argued: April 9, 2015
Opinion Issued: October 14, 2015


Pierce Atwood LLP, of Portsmouth (Michele E. Kenney on the brief and orally), for the plaintiff.

Bernstein, Shur, Sawyer & Nelson, P.A., of Manchester (Andru H. Volinsky and Talesha L. Caynon on the brief, and Ms. Caynon orally), for the defendant.


BASSETT, J. Following a bench trial in Superior Court (Delker, J.), the court denied the petition of the plaintiff, Celestica, LLC (Celestica), requesting a declaration that the defendant, Communications Acquisitions Corporation d/b/a Whaleback Managed Services (CAC), is obligated to pay the balance of a judgment that Celestica had obtained against another business, the assets of which CAC had purchased at public auction. Specifically, the trial court ruled that, when CAC purchased the assets of Whaleback Systems Corporation (Whaleback), the transaction did not amount to a de facto merger between the

two companies.  On appeal, Celestica argues that the trial court erred by not imposing successor liability upon CAC under the de facto merger doctrine.  We affirm.

I. Factual Background

The trial court found the following facts, which are not in dispute on appeal.  Whaleback was founded to provide telecommunications services through Voice Over Internet Protocol (VOIP) to small and mid-sized businesses.  Whaleback, which operated primarily from Portsmouth, was funded by a group of venture capital firms.  The primary investors in Whaleback were:  (1) Ascent Venture Partners IV, LP (Ascent), which owned 53.1% of the stock; (2) Egan Managed Capital III, LP (Egan), which owned 22.7%; and (3) Castile Ventures III, LP (Castile), which owned 17.8%.  Fifteen other individuals owned the remaining 6.4% of the Whaleback stock.

Whaleback was also funded through a series of secured loans.  Horizon Technology Funding Company, LLC (Horizon) lent Whaleback $3 million (Horizon Loan), and was the primary secured lender.  Horizon held a security interest in all of Whaleback's assets, "including equipment, inventory, accounts receivable, and intellectual property rights."  Subordinate to Horizon's secured interest, the three primary shareholders of Whaleback — Ascent, Egan, and Castile — also provided secured loans to Whaleback in the amounts of $4.8 million, $2 million, and $1.2 million respectively.

In 2011, after Whaleback defaulted on the Horizon Loan, the investors began looking for new sources of funding. Hercules Technology Growth Capital offered to lend Whaleback $2 million, provided that the equity investors invested an additional $700,000 in the company.  Ascent, however, responded that it would provide only $50,000 of additional capital.  Castile and Egan declined to invest more capital as long as Whaleback continued to operate under its existing business model.  Hercules eventually withdrew its offer.

Soon thereafter, Whaleback board members Roger Walton, of Castile, and Michael Shanahan, of Egan, discussed forming a new company to acquire Whaleback's assets. Walton had a background in information technology, and believed that Whaleback had valuable technology but had a flawed business model.  Walton and Shanahan met with Karil Reibold, the CEO of Whaleback, to discuss the future of the company.  The three men then approached Horizon with a proposal whereby Castile and Egan would create a new company and purchase Whaleback's assets from Horizon.  Under the proposal, Castile and Egan would pay Horizon $500,000, plus $50,000 in legal fees and costs.  The plan also contemplated that Horizon would pay $125,000 to keep Whaleback operating until the sale closed, at which time Castile and Egan would reimburse Horizon for this expense.

2

The parties ultimately agreed to the following terms, which were memorialized by a Letter of Intent (LOI) dated November 15, 2011. Castile and Egan would fund Whaleback's operations between the signing of the LOI and the closing. Horizon would conduct a public auction of Whaleback's assets. The minimum bid at the auction was set at $600,000, and any interested bidder would be required to submit a $60,000 deposit on the day before the auction. Castile and Egan also had a right of first refusal, allowing them to match any higher bid. If they chose not to match a higher bid, Castile and Egan would receive a refund of any money invested in Whaleback to keep it operational between the LOI and closing.

On November 15, the same day that the LOI was signed, Horizon sent a notice to Whaleback stating that Whaleback was in default on the Horizon Loan, thus triggering Horizon's right to sell all of Whaleback's assets at auction. Notice of the public auction was sent to all secured lenders and to Celestica. Notice was also published in the <u>Manchester Union Leader</u> and the <u>Boston Globe</u>, and posted on the auctioneer's website.

At the November 29 auction, CAC, the new company formed by Castile and Egan, was the only bidder for Whaleback's assets.* It bid $600,000. Prior to the December 7 closing, George Vaughn, who was hired to serve as CEO of CAC, worked with Reibold to keep Whaleback running, because "if there was an interruption in the business for any length of time then all of [Whaleback's] customers would be lost." Thus, to ensure that it could provide uninterrupted service to its customers prior to the closing, CAC honored some of the debts owed by Whaleback to existing vendors. Vaughn was ultimately responsible for deciding which of Whaleback's contracts that CAC would honor during the interim period.

The asset sale closed as planned. CAC "acquired all of . . . Whaleback's assets, including the good will, existing customers, equipment, and intellectual property," free from any of Whaleback's liabilities, including the judgment that Celestica had obtained against Whaleback. After the closing, Whaleback had no assets. Whaleback was not formally dissolved because it did not have sufficient funds to pay for its dissolution.

In 2012, Celestica filed a petition for declaratory judgment in superior court, seeking a declaration that the asset sale between Whaleback and CAC constituted a <u>de facto</u> merger of the two companies. Celestica asked the trial court to rule that, under the theory of successor liability, CAC was "fully and

---

* The actual bidder at auction was a predecessor of CAC named Communications Acquisitions, LLC. However, because the distinction between the two companies does not matter for purposes of this opinion, we refer to both entities as "CAC."

completely" liable for the judgment that Celestica had obtained against Whaleback. Following a three-day bench trial, the trial court declined to impose successor liability on CAC. This appeal followed.

## II. Standard of Review

Celestica first argues that we should review the trial court's decision de novo because it "does not challenge the facts found by the trial court, but rather, the significance attributed to the facts and legal conclusions drawn from them." CAC counters that the imposition of successor liability is an equitable remedy within the sound discretion of the trial court, and, therefore, the trial court's ruling is owed deference on appeal. We agree with CAC.

Claims of successor liability, including the application of the de facto merger doctrine, are equitable in nature. See Bielagus v. EMRE of N.H., 149 N.H. 635, 639 (2003). "The propriety of affording equitable relief in a particular case rests in the sound discretion of the trial court." Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 669 (2013) (quotation omitted). "We review the trial court's factual findings under the clearly erroneous standard to determine if they are supported by evidence presented at trial." Bielagus, 149 N.H. at 639. We will not overturn the trial court's decision regarding equitable relief absent an unsustainable exercise of discretion. See Conant v. O'Meara, 167 N.H. __, __ (decided May 15, 2015).

"To show an unsustainable exercise of discretion, [Celestica] must demonstrate that the court's ruling was clearly unreasonable or untenable to the prejudice of [its] case." Axenics, 164 N.H. at 669. "Although the award of equitable relief is within the sound discretion of the trial court, that discretion must be exercised, not in opposition to, but in accordance with, established principles of law." Id. (quotation omitted). "Our inquiry is to determine whether the evidence presented to the trial court reasonably supports the court's findings, and then whether the court's decision is consonant with applicable law." Bielagus, 149 N.H. at 639 (quotation omitted).

## III. The De Facto Merger Doctrine

A general precept of commercial law is that "a corporation purchasing assets of another corporation is not liable for the seller's debts." Id. at 640. "This rule . . . allows, in the regular course of business, free alienability of corporate assets to maximize their productive use." Id. "There are judicially recognized exceptions to this rule, however, intended to prevent corporations from evading their business obligations to creditors by selling their assets." Id. "Under the de facto merger exception, successor liability will be imposed if the parties have achieved virtually all of the results of a merger without following the statutory requirements for merger of the corporations." Id. at 640-41

4

(quotation omitted); see RSA 293-A:11.07(a) (Supp. 2014) (describing the circumstances in which a merger between two entities becomes effective). In Bielagus, we enumerated four non-exclusive factors to be considered when determining whether a purported sale of assets is, in fact, a de facto merger. Bielagus, 149 N.H. at 640-43. Those factors are whether:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.
> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.
> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
> (4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

Id. at 642 (quotation omitted). "The factor that usually tips the scales in favor of finding a merger is continuity of ownership, usually taking the form of an exchange of stock for assets." Id. (quotation omitted). In addition to the four factors, "[t]he fact-finder may look to other factors indicative of commonality or distinctiveness with the corporations." Id. at 641.

### A. Continuation of the Enterprise of the Seller Corporation

The trial court first considered whether "[t]here is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations." Id. at 642. The trial court observed that "[t]his factor superficially supports the conclusion that [CAC] was a mere continuation of [Whaleback]." However, it is apparent from the trial court's order that, upon closer analysis, it found that this factor did not weigh in favor of imposing successor liability. Celestica argues that the trial court erred when it "tried to explain away the facts showing a continuity of the enterprise," which, it argues, "are controlling." We disagree.

Although the trial court observed that Whaleback and CAC "looked like the same company immediately before and after the sale," it made numerous factual findings in support of its conclusion that the enterprise of CAC materially differed from that of Whaleback. For instance, with regard to continuity of management, the trial court credited the testimony of Walton,

5

Castile's member on the Whaleback board of directors, that immediate turnover of management would have been detrimental to the value of the assets that CAC purchased. Walton testified that "if there was any disruption in service as a result of firing management or employees, the customer base would immediately disappear and the value of the company would be lost." The trial court found that "within 14 months of the foreclosure sale virtually the entire management team was replaced," and that only the Chief Technology Officer remained employed by CAC.

Further, prior to the asset sale, Castile and Egan each held only one of six seats on Whaleback's board of directors. After the closing, Castile and Egan held a total of three of four seats on CAC's board of directors, giving them control of the CAC board. As the trial court noted, "before the sale Castile and Egan did not control . . . Whaleback either through equity ownership or on the Board of Directors," but "[a]fter the sale Castile and Egan [controlled] the new company from both positions."

As for personnel, the trial court found that Whaleback had employed 28 staff members, and that, at the time of the trial, only half of those employees worked for CAC. The trial court recounted Walton's testimony that "it took time to identify which employees continued to provide valuable services and to replace those who were not productive without disrupting service to the customers." Additionally, employees' stock options in Whaleback were cancelled, and each employee was granted new stock options in CAC "based on the employee's value to" CAC.

In regard to continuity of CAC's business operations, the trial court referenced Walton's testimony that Whaleback's financial problems stemmed not from its services or technology, but rather from its "poor control over the cash flow." To that end, CAC brought in a new CEO, Vaughn, and gave him full control over spending. CAC also reduced its payments to resellers, who acted as middlemen between CAC and its customers, from 20% of the customer's contract to 10%, a change that "dramatically improved" CAC's revenue stream. CAC also moved to a "cloud-based" system to provide upgrades to customers remotely, as opposed to individually servicing each customer's computer. Although Whaleback had developed the remote upgrade system, it did not invest the resources to implement it.

Additionally, in April 2013, CAC moved its operations from the facilities that Whaleback had used in Portsmouth and in Bedford, Massachusetts, to new locations in Boston and Virginia. The trial court found that the new facilities "were an upgrade and involved a completely different generation of equipment and technology from that used by . . . Whaleback in the prior facilities."

Finally, the trial court found that Castile and Egan "invested an additional $1.1 million in equity and $200,000 in loans into [CAC] in order to implement the new business model." The trial court observed that "[t]his money was necessary not just to keep Whaleback from bankruptcy but also to transition to new co-location facilities and to migrate customers to a new cloud-based technology." Moreover, these investments do not include the additional money that Castile and Egan spent to keep Whaleback operational between the auction and closing.

Given these factual findings — none of which are in dispute on appeal — there is ample evidence in the record to support the trial court's conclusion that the continuation-of-the-enterprise factor did not weigh in favor of imposing successor liability.

B. Continuity of Shareholders

The second Bielagus factor is whether "[t]here is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation." Bielagus, 149 N.H. at 642. "In traditional corporate law, the key factors to finding a de facto merger are the exchange of stock and continuity of ownership, because shareholders are the indirect beneficiaries of any increase in a corporation's assets or any decrease in its liabilities." Id. at 643. "The existence of these factors suggests an asset sale is not actually a bona fide business transaction . . . ." Id.

Celestica first argues that the trial court's order "suggest[s]" that a "de facto merger requires uniformity of ownership between the old and new company." We disagree with Celestica's interpretation of the trial court order. See Choquette v. Roy, 167 N.H. __, __, 114 A.3d 713, 718 (2015) ("The interpretation of a trial court order is a question of law, which we review de novo."). The trial court did not rule that uniformity of ownership is required to demonstrate a de facto merger. Rather, after recognizing that a de facto merger could be found absent uniformity, the trial court declined to find that, simply because Castile and Egan were shareholders in both companies, this factor favored imposing successor liability.

The trial court, after observing "that [Celestica] is correct that a foreclosure sale, in and of itself, does not terminate the successor liability inquiry," went on to examine the circumstances surrounding the sale, concluding that, despite the fact that "Castile and Egan were shareholders in both companies, there was a bona fide change in ownership as a result of the foreclosure sale." There is ample evidence to support this finding. Prior to the

closing, Castile and Egan owned 17.8% and 22.7%, respectively, of the stock in Whaleback. Castile and Egan paid $600,000 in cash for Whaleback's assets, and after the closing, Castile owned 66.7% of CAC, and Egan owned 33.3%. As the trial court noted, Castile changed from "the smallest institutional shareholder in . . . Whaleback to holding an outright majority of the new company." Importantly, Ascent, Whaleback's majority shareholder, did not have an equity interest in CAC, nor did 15 other investors in Whaleback.

In light of these findings, Celestica has not demonstrated that the trial court erred in finding that the continuity-of-shareholders factor weighed against imposing successor liability.

### C. Cessation of the Business of the Seller Corporation

The trial court next considered the third Bielagus factor: whether the "seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible." Bielagus, 149 N.H. at 642. The trial court noted that "on its face this factor tends to support imposing successor liability" because "[t]here is no question that . . . Whaleback functionally ceased operations without any capital after the foreclosure sale." Nevertheless, the trial court observed that "good will and an existing customer base" were valuable assets and, had "Whaleback's property been liquidated and its operations ceased[,] Horizon would have lost these two valuable assets." Accordingly, the trial court did not give this factor much weight. Celestica argues that the trial court erred in doing so. We disagree.

Celestica first argues that the trial court erred when it stated that this case is similar to Bielagus. However, the trial court did not state that this case was similar to Bielagus in all respects; rather it cited Bielagus in support of the proposition that a debtor's liabilities may be "cut off" in some cases in which the buyer continues the business operations of the seller. Indeed, in that particular respect, this case is similar to Bielagus, a case in which the purchaser bought and continued operations of the seller's residential real estate business, the trial court ruled that the sale did not amount to a de facto merger, id. at 638-39, and we upheld that determination, id. at 644.

Celestica also asserts that the trial court erred by determining that it would have constituted waste if CAC had not carried on Whaleback's business operations, a consideration that Celestica maintains is "irrelevant" to the de facto merger doctrine. We disagree. As we observed in Bielagus, "[i]nherent in an asset transfer is the purchaser's right to operate in the business to which the assets are suited . . . . Corporations purchase assets in order to use them; to do otherwise would constitute waste." Id. at 642 (quotation omitted). We are not persuaded that the trial court erred in considering whether waste would have resulted if CAC had not carried on Whaleback's business

8

operations or in assigning minimal weight to this factor in its <u>Bielagus</u> analysis.

### D. Assumption of Seller Corporation's Obligations

The fourth <u>Bielagus</u> factor is whether "[t]he purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." <u>Id</u>. Celestica argues that the "trial court misapplied this <u>de facto</u> merger factor, concluding that there [was] no successor liability <u>because</u> [CAC] assumed only critical business liabilities of . . . Whaleback." Once again, we disagree with Celestica's reading of the trial court order.

The trial court found that CAC assumed only those liabilities that it deemed necessary to ensure continued operation of the company. It specifically observed that CAC "did not blindly assume [Whaleback's] liabilities," but "agreed only to maintain those obligations which were crucial to preserve the company's good will and continued customers." Importantly, the trial court noted that, "[h]ad CAC assumed liability for some non-essential debts, such as those to the insiders, this factor would weigh heavily in favor of [a] finding of successor liability." Here, the trial court reasonably concluded that, because it had found that Castile and Egan "lost millions of dollars in secured debt" — as had other investors — the assumption of only critical business liabilities was not a factor weighing in favor of finding successor liability. Thus, the trial court's analysis was more detailed and nuanced than Celestica contends: the trial court did not rule that, simply because CAC assumed only the liabilities necessary to continue Whaleback's operations, successor liability should not be imposed. We are not persuaded that the trial court erred in its analysis of this factor.

### E. Other Factors

Finally, in <u>Bielagus</u>, we stated that, in addition to the four enumerated factors, the "fact-finder may look to other factors indicative of commonality or distinctiveness with the corporations." <u>Id</u>. at 641. Here, the trial court considered the circumstances of the foreclosure sale itself, and concluded that CAC's purchase was the product of arms-length negotiations which resulted in adequate consideration being paid for the assets. Celestica argues that considerations such as adequacy of consideration and absence of collusion between Horizon and CAC were improperly considered by the trial court and are irrelevant to the <u>de facto</u> merger inquiry. We disagree.

"A primary purpose of the <u>de facto</u> merger exception is to protect dissenting shareholders or creditors from a transaction that is a ploy to avoid the seller's liabilities." <u>Devine & Devine Food v. Wampler Foods</u>, 313 F.3d 616,

9

619 n.3 (1st Cir. 2002). "Courts commonly appeal to this doctrine where the asset transfer in question was <u>neither an arms-length bargain nor supported by adequate consideration</u>." <u>Id</u>. (emphasis added); <u>see</u> <u>also</u> <u>Bielagus</u>, 149 N.H. at 643 (stating that continuity of ownership is an important factor given its tendency to demonstrate that "an asset sale is not actually a <u>bona</u> <u>fide</u> business transaction").

Here, the trial court determined that the asset sale was <u>bona</u> <u>fide</u> and that "this circumstance weighs in favor of the finding that there is no successor liability." The trial court found that "Horizon's lawyer testified credibly that he negotiated at arms-length with CAC's lawyers and Horizon's only interest was in minimizing its losses." To that end, the primary secured lender, Horizon, which had the undisputed right to foreclose and sell Whaleback's assets, held a widely advertised public auction, at which Celestica could have bid. Also, Horizon required a starting auction bid of $600,000, an increase of $100,000 from the original proposal by Castile and Egan to buy Whaleback's assets. The trial court noted that, given the amount of Whaleback's secured debt, if Whaleback's business had been liquidated, Celestica, as an unsecured judgment creditor, would not have received any money. We are not persuaded that the trial court erred when it found that the circumstances surrounding the foreclosure sale supported its conclusion that there was no <u>de</u> <u>facto</u> merger.

Finally, Celestica argues that the trial court "[c]onflated" the <u>de</u> <u>facto</u> merger doctrine with the successor liability doctrines of fraud and "mere continuation." We disagree. In fact, as courts in other jurisdictions have observed, there is a substantial overlap between the doctrines giving rise to successor liability. <u>See</u>, <u>e.g.</u>, <u>National Gypsum Co. v. Continental Brands Corp.</u>, 895 F. Supp. 328, 336 (D. Mass. 1995) (referring to "<u>de</u> <u>facto</u> merger" and "mere continuation" as "[s]light variations on the theme of fraudulent conveyance" and stating "[w]hile these two labels have been enshrined separately in the canonical list of exceptions to the general rule of no successor liability, they appear, in practice to refer to the same concept and courts have often used the two terms interchangeably" (citation omitted)); <u>Cargo Partner AG v. Albatrans, Inc.</u>, 352 F.3d 41, 45 n.3 (2d Cir. 2003) ("Some courts have observed that the mere-continuation and de-facto-merger doctrines are so similar that they may be considered a single exception."). Accordingly, we conclude that the trial court did not err in its analysis or application of the doctrines that give rise to successor liability.

IV. Conclusion

Accordingly, we hold that there is ample support for the trial court's conclusion that CAC is not merely Whaleback "reincarnated as a different entity," and that the trial court sustainably exercised its discretion when it

10

refused to impose successor liability on CAC and denied Celestica's request for declaratory relief.

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY, and LYNN, JJ., concurred.