No. 118,334

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

WELLS FARGO VENDOR
FINANCIAL SERVICES, LLC,
*Appellant*,

v.

NATIONWIDE LEARNING, LLC and
STUDENTREASURES ACQUISITION, LLC,
*Appellees*.

SYLLABUS BY THE COURT

1.

The application of corporate successor liability, an equitable doctrine, rests within the sound discretion of the district court.

2.

Generally, where one company sells or otherwise transfers all of its assets to another company, the purchaser is not liable for the debts and liabilities of the seller. We recognize four exceptions to that general rule: (1) the purchasing company expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the corporation; (3) the purchasing company is merely a continuation of the selling company; or (4) the purchasing company enters into the transaction fraudulently to escape liability for such debts.

3.

Purchasing a company's assets at a UCC foreclosure sale does not automatically exempt the purchasing company from successor liability.

1

4.

Elements in determining whether a purchasing company is merely a continuation of a selling company include whether (1) corporate assets were transferred; (2) the purchasing company paid inadequate consideration; (3) the purchasing company continued the business operation of the selling company; (4) both companies had at least one common officer or director who was instrumental in the transfer; (5) the transfer rendered the selling entity incapable of paying its creditors' claims because it was dissolved; (6) the purchasing company held itself out to others as a continuation of the selling company; and (7) the purchasing company assumed or paid liabilities ordinarily necessary for the uninterrupted continuation of the selling company's business. No one element is necessarily decisive nor must all elements necessarily exist together.

5.

The "avoidance of debt" exception applies when a purchasing company enters into the transaction fraudulently, i.e., for the purpose of escaping liability for the selling company's debts. This exception applies only when the selling company shows the purchasing company's actual fraud, by clear and convincing evidence.

6.

Under the Kansas Uniform Fraudulent Transfer Act, property which is encumbered by valid liens that equal or exceed the value of the property is not an asset and cannot be subject to a fraudulent transfer.

7.

Punitive damages may be awarded incident to equitable relief without an award of actual damages.

Appeal from Wyandotte District Court; ROBERT P. BURNS, judge. Opinion filed August 17, 2018. Affirmed in part and reversed in part.

*Thomas G. Berndsen*, of Law Offices of Thomas G. Berndsen, P.C., of St. Louis, Missouri, and *Thomas J. Fritzlen Jr*. and *Matthew M. Peters*, of Kansas City, Missouri, for appellant.

*David M. Skeens* and *Bruce V. Nguyen*, of Walters Renwick Richards Skeens & Vaughan, P.C., of Kansas City, Missouri, for appellee.

Before GARDNER, P.J., PIERRON, J., and WALKER, S.J.

GARDNER, J.: Wells Fargo Vendor Financial Services (Wells Fargo) obtained a judgment against Nationwide Learning, LLC (Nationwide) for breach of its equipment lease contract. Wells Fargo sought to enforce that judgment against Studentreasures Acquisition, LLC (Studentreasures), who had acquired Nationwide's assets, on the theory of successor liability. The district court held that Studentreasures was not liable for Nationwide's debt to Wells Fargo because no exception applied to the general rule that a purchasing corporation is not liable for the debts of a selling corporation. Wells Fargo also sued Studentreasures under the Kansas Uniform Fraudulent Transfer Act (KUFTA), K.S.A. 33-201 et seq., but the district court found it failed to establish a fraudulent transfer and was not entitled to punitive damages. We find that the district court made several errors of law that influenced its factual findings and compel us to reverse on the successor liability claim. Otherwise, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 1994, Joseph Gigous founded Nationwide Learning, Inc. in Topeka. Its product was books containing student-created content. It provided "kits" to teachers or students to collect stories, pictures, or other work to be published in a custom book. The kits were returned to the company in the spring and were made into bound books. Nationwide

3

scanned the students' work, bound the students' original pages into a free copy, and printed additional copies to sell to families and teachers.

In 2010, Nationwide was incorporated to purchase the business assets from Gigous. The purchase price was $6.825 million and Gigous took back a note for $2 million. The purchase was financed with capital from Brass Ring and additional capital it secured from a "mezzanine lender," C3 Capital Partners II, LLP (C3). Brass Ring contributed $2.5 million in equity and C3 contributed $250,000 in equity and $2.5 million through a Securities Purchase Agreement. A Security Agreement in favor of C3, titled "14% Secured Subordinate Note" (Note) was also executed, showing that C3's contribution was secured by a blanket security interest in all of Nationwide's assets. C3 filed a UCC Financing Statement reflecting this interest. The issues in this case arise from Studentreasures's eventual foreclosure on this Note.

At first, Brass Ring was the majority shareholder, owning about 73% of the company. C3 held about 18%, and Gigous held about 9%. Of the five board of director seats, Gigous held one, two were allocated to Brass Ring, one was allocated to C3, and one director was selected by a majority of the board. C3 exercised its option to appoint a sixth "observer" director who was a non-voting member but had proxy voting authority for the C3 director.

In early 2014, Konica Minolta solicited Nationwide to lease new printing equipment to replace its older printers. Nationwide's board of directors considered whether to continue in-house production on leased printers or to outsource production. The board decided to lease seven new printers, three of them from Minolta. Wells Fargo obtained the lease agreements on those three printers after a series of assignments. Wells Fargo filed a UCC Financing Statement on its interest in the printers. As of May 2015, Nationwide had about $1.7 million of printer lease obligations to be paid over the next

4

three years. Those lease obligations for the three printers form the underlying basis for Wells Fargo's claim here.

The printers were primarily used in the spring because the large majority of book kits were returned near the end of the school year, so the work flow and cash flow varied over the course of the year. Throughout the year, Nationwide drew on an annually-renewable $3.4 million line-of-credit loan from Enterprise Bank. It then paid that line of credit down to zero in April or May when seasonal sales revenue flowed in. This line of credit was secured by all of Nationwide's assets, and the bank's security interest—when a balance was owed—was superior to C3's security interest.

In 2012, before Nationwide acquired the seven new printers, and in each following year, Enterprise Bank placed additional terms or restrictions on the line of credit. A bank representative testified that Nationwide had underperformed for three years. Enterprise Bank renewed the line of credit for the 2014-15 school year only after getting loan guaranties of $250,000 each from C3 and Renovare (Brass Ring's financing arm) and $150,000 each from Gigous and Timothy Keane, a member of Nationwide's Board of Directors. In February 2015, Enterprise notified Nationwide that to renew the line for the 2015-16 school year, Nationwide would need to invest an additional $900,000 equity and trim expenses to show a profitability of $500,000 as calculated by the Earning Before Interest, Taxes, Depreciation, and Amortization (EBITDA) method.

In response, David Raffel, one of the principals of Brass Ring, proposed a restructuring that would meet the required equity infusion with contributions by the owners and would increase C3's ownership to about 43%. Ultimately, Gigous withdrew his support for the proposal and C3 rejected it. Nationwide then sought additional investors or possible purchasers for the company. It received two offers, but C3 rejected both.

5

In early 2015, Nationwide experimented with outsourcing some of its production and then tried to renegotiate its obligations to equipment lessors, including Wells Fargo, because the lease expenses hindered its profitability. At least as early as May 2015, Steve Swartzman, Timothy Keane, and Jared Poland began discussions and email conversations about foreclosing on C3's Note to "reconstitute the business in a new entity" and "save the future lease expense." Swartzman and Keane were voting members of Nationwide's Board of Directors, and Poland was C3's Managing Director, who could vote as a proxy in Swartzman's absence.

On June 29, 2015, Nationwide's line of credit with Enterprise Bank expired and the bank was not willing to renew it. On June 30, 2015, accrued interest on C3's Note in the amount of $588,607 became due and was not paid. On July 7, C3 sent a notice of default stating that it was foreclosing and accelerating all amounts owed, for a total demand of over $3.1 million. That same day, C3's counsel served a notice of disposition of collateral. A UCC Article 9 foreclosure sale was held on July 24, 2015. C3 was the only bidder and purchased all of Nationwide's assets by "credit-bidding" its $2.5 million Note. C3 then conveyed those assets to Studentreasures, which it had formed as its nominee for the purpose of acquiring Nationwide's assets.

In October 2015, C3 conducted a second foreclosure sale in which it purchased notes that Chad Zimmerman and Chad Turnbull (officers of Nationwide who became officers of Studentreasures) had granted Nationwide to purchase Class B ownership units. That sale was intended to prevent any of Nationwide's unpaid creditors who might obtain judgments against Nationwide from being able to execute against the notes and collect from the officers.

Wells Fargo repossessed the collateral and sold the printers. It then sued Nationwide, a defunct corporation, for breaching the lease agreement for the printers. Wells Fargo also sued Studentreasures for actual and punitive damages on theories of

6

successor liability and violation of the KUFTA. The district court entered default judgment against Nationwide for $492,836.40 in damages and attorney fees but ruled against Wells Fargo on its other claims. Wells Fargo timely appeals.

## DID THE DISTRICT COURT ABUSE ITS DISCRETION IN APPLYING THE GENERAL RULE OF NO CORPORATE SUCCESSOR LIABILITY?

We first review the district court's ruling on Wells Fargo's claim that Studentreasures is liable under the doctrine of successor liability.

*Our standard of review is abuse of discretion.*

The doctrine of successor liability is an equitable doctrine. See *Ramsey v. Adams*, 4 Kan. App. 2d 184, 186, 603 P.2d 1025 (1979) (corporate veil pierced "[w]hen equity demands"). Under Kansas law, the application of an equitable doctrine rests within the sound discretion of the district court. *Consolver v. Hotze*, 306 Kan. 561, 568, 395 P.3d 405 (2017); *Green v. Higgins*, 217 Kan. 217, 220, 535 P.2d 446 (1975). We thus review the district court's decision for an abuse of discretion.

The abuse of discretion standard requires us to review (1) whether the factual basis of the decision is supported by substantial competent evidence; (2) whether the district court has correctly identified and properly applied the applicable legal principles; and (3) whether the district court's decision is such that no reasonable person would take the view adopted by the court. *State v. Gonzalez*, 290 Kan. 747, 756, 234 P.3d 1 (2010). We define substantial evidence as evidence that a reasonable person might accept as sufficient to support a conclusion. *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014). We review the district court's legal conclusions from those facts de novo. See *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014). And if we find no factual or legal error, we then look to the reasonableness of the district

7

court's decision and reverse only if no reasonable person would agree with the decision. *Cresto v. Cresto*, 302 Kan. 820, 848-49, 358 P.3d 831 (2015).

*Kansas cases recognize the general rule of corporate successor nonliability, with a few exceptions.*

Kansas has adopted the "general rule of nonliability of a transferee corporation for the prior debts of the transferor." *Comstock v. Great Lakes Distributing Co.*, 209 Kan. 306, 310, 496 P.2d 1308 (1972); see *Kansas Comm'n on Civil Rights v. Service Envelope Co.,* 233 Kan. 20, 25, 660 P.2d 549 (1983); *Mank v. Southern Kansas Stage Lines Co.,* 143 Kan. 642, 645, 56 P.2d 71 (1936). Under this rule, when one corporation sells or transfers all of its assets to another corporation, the purchasing corporation is not liable for the debts of the selling corporation. *Comstock*, 209 Kan. at 310. The general rule applies only "where the contracting corporations and their representatives are dealing with each other at arm's length, and where each side is looking out for the interest of its own corporation. That rule cannot be applied when the negotiators for both corporations are the same or virtually the same, and the transfer of assets is made merely for their own convenience and advantage." *Avery v. Safeway Cab, T. & S. Co.*, 148 Kan. 321, 325, 80 P.2d 1099 (1938).

We recognize four exceptions to the general rule: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the corporations; (3) the purchasing corporation is merely a continuation of the selling corporation; and (4) the transaction is entered into fraudulently in order to escape liability for the seller's debts. *Comstock*, 209 Kan. at 310. Wells Fargo asserts the third and fourth exceptions.

8

*Kansas cases apply the doctrine sparingly.*

Few Kansas cases have applied the doctrine of successor liability. *Avery* did so, finding "[w]here transfer of assets strips a debtor corporation of all its assets and disables the corporation from earning money to pay its debts, thus leaving creditors and holders of claims no resources to which they may look for the payment, the net result is in legal effect a fraud; and the courts will subject the transferee to liability for the satisfaction of claims against the corporation whose assets [transferee] has absorbed." 148 Kan. at 324. In *Avery*, the Kansas Supreme Court noted our court's emphasis on fairness over form:

> "In our survey of the authorities we note an attitude on the part of some eminent courts to give greater respect to the mere formality of separate corporate entities than is done in this jurisdiction. In *Coal Co. v. Nicholson*, 93 Kan. 638, 653, 145 P. 571, Mr. Justice Porter said: 'The decisions of this court indicate a tendency to disregard the theory of a corporation as an entity separate from its corporators where justice between the real parties to the transaction requires it.'" *Avery*, 148 Kan. at 325-26.

More recently, the Tenth Circuit applied the successor liability doctrine under Kansas law, affirming the purchasing corporation's liability for the debts of the selling corporation under the mere continuation and fraud exceptions. *Moore v. Pyrotech Corp.*, No. 92-3404, 1993 WL 513834, at *4 (10th Cir. 1993) (unpublished opinion). Based on *Avery*, *Moore* noted that "Kansas courts appear to be more willing than some other jurisdictions to disregard formally distinct corporate entities." And it found "no indication in cases subsequent to *Avery* that the courts have retreated from this expansive view." 1993 WL 513834, at *4.

In contrast, the Kansas Supreme Court found no successor liability in *Comstock*. It found the purchasing company was not a "continuation or reincarnation" of the selling company for two reasons. First, none of the incorporators of the purchasing company was a stockholder or officer of the selling company when the purchasing company was

9

chartered. Second, the selling company remained a going business and continued as a corporate entity. *Comstock*, 209 Kan. at 312. The court also found no evidence of fraud or collusion: "no evidence [exists] in the instant case of any direct dealings between the two corporations-no transfer of capital stock, assets, contracts or franchises and no evidence of any agreement or understanding between the two corporations." 209 Kan. at 312-13.

Similarly, the United States District Court for the District of Kansas found that, under Kansas law, a limited liability company owned by a son was not subject to successor liability for debts of a sole proprietorship, owned by his father. *Crane Const. Co. v. Klaus Masonry, LLC*, 114 F. Supp. 2d 1116 (D. Kan. 2000). There, the son's company had the same name as the proprietorship and was engaged in same business, from the same location. But the son had no ownership interest in the business before his father's death, and the creditor's inability to recover payment from the father was because of its failure to file a claim against his estate. *Crane*, 114 F. Supp. 2d 1116. And in *Stratton v. Garvey Internat'l, Inc.*, 9 Kan. App. 2d 254, 265-67, 676 P.2d 1290 (1984), we found the continuation exception inapplicable under the facts.

From these cases, we understand that application of the equitable doctrine of successor liability is fact-specific, and that the underlying goal is to determine whether justice between the real parties to the transaction requires imposition of successor liability.

10

A. DOES THE UCC FORECLOSURE SALE PRECLUDE SUCCESSOR CORPORATION
LIABILITY?

We first address the threshold question of whether common law successor liability can apply when the purchasing corporation acquires the assets in a UCC Article 9 foreclosure sale. Studentreasures contends that even if the facts bring it within an exception to the general rule of nonliability of successor corporations, the fact that it bought Nationwide's assets at a UCC Article 9 foreclosure sale insulates it from liability.

Studentreasures bases its argument on the following statement in *Comstock*: "the subsequent bona fide acquisition of some [of the predecessor's] property after foreclosure and sale cannot serve as a premise for a claim of fraud." 209 Kan. at 312. Studentreasures characterizes *Comstock* as involving "a transfer of assets pursuant to a foreclosure sale . . . and the court found no basis for applying the 'mere successor' or 'fraud' exceptions." But in *Comstock*, our Supreme Court found no sale or transfer of anything between the two corporations. The machinery and equipment at issue passed through first and second purchasers before being acquired by the defendant, and neither purchaser acted as a "strawman" between the corporations. 209 Kan. at 311. The court's decision that the defendant was not a successor corporation thus did not turn on the fact of a foreclosure sale. Instead, our Supreme Court considered the common law theory of liability, suggesting that it is not precluded just because of a foreclosure sale.

Other jurisdictions have explicitly addressed this issue. The consensus in those jurisdictions is that the UCC does not preempt or usurp all common law remedies. See *Continental Ins. Co. v. Schneider, Inc.*, 582 Pa. 591, 602-03, 873 A.2d 1286 (2005) (citing cases). "[E]xisting case law overwhelmingly confirms that an intervening foreclosure sale affords an acquiring corporation no automatic exemption from successor liability." *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 267 (1st Cir. 1997)." Thus, "[t]he mere fact that the transfer of assets involved foreclosure on a

11

security interest will not insulate a successor corporation from liability where other facts point to continuation." *Stoumbos v. Kilimnik*, 988 F.2d 949, 961-62 (9th Cir. 1993). See also 15 Fletcher Cyclopedia of Corporations § 7122, at 244-45 (2017) ("Successor liability may be imposed even where the business assets were purchased pursuant to a foreclosure sale.")

Nothing in the UCC itself supports Studentreasures' argument that the foreclosure sale provides a safe harbor against successor liability claims. See *Glynwed, Inc. v. Plastimatic, Inc*., 869 F. Supp. 265, 274 (D. N.J. 1994). The UCC provides that a foreclosure sale normally discharges the security interest being foreclosed and any subordinate security interests and other liens. See K.S.A. 2017 Supp. 84-9-617. But contrary to Studentreasures' position, the UCC explicitly provides that "[u]nless displaced by the particular provisions of the uniform commercial code, the principles of law and equity . . . supplement its provisions." K.S.A. 2017 Supp. 84-1-103(b). Successor liability is such an equitable principle, both in origin and nature. See *Ramsey*, 4 Kan. App. 2d at 186; *Ed Peters Jewelry*, 124 F.3d at 267.

Nothing in the nature of the foreclosure process preempts the successor liability inquiry. As *Continental* found: "there is a distinction between permitting an unsecured creditor to *assert a lien* against assets that have been sold pursuant to a section 9-504 [UCC] foreclosure sale and permitting an unsecured creditor to *assert a claim* of successor liability" to recover a debt from the purchaser of the collateral. (Emphasis added.) 582 Pa. at 602.

> "[B]y its very nature the foreclosure process cannot preempt the successor liability inquiry. Whereas liens relate to assets (*viz.,* collateral), the indebtedness underlying the lien appertains to a person or legal entity (*viz.,* the debtor). Thus, although foreclosure by a senior lienor often wipes out junior-lien interests in the same collateral, it does not discharge the debtor's underlying obligation to junior lien creditors. [Citations omitted.]" *Ed Peters Jewelry*, 124 F.3d at 267.

12

A UCC Article 9 sale focuses exclusively on the effect a foreclosure sale has upon subordinate liens. In contrast, the successor liability doctrine focuses exclusively on the extinguishment of a debt, be it secured or unsecured.

Although no Kansas case has addressed this issue, we believe the rationale expressed in the cases noted above makes good sense. "Otherwise, unscrupulous businesspersons would be able to avoid successor liability and cheat creditors merely by changing the form of the transfer." *Stoumbos*, 988 F.2d at 961. Based on the persuasive authority cited above, we find Studentreasures' purchase of the company through a UCC Article 9 foreclosure sale does not preclude its liability under the equitable common law theory of successor liability.

B. DID THE DISTRICT COURT ABUSE ITS DISCRETION IN RULING THAT STUDENTREASURES WAS NOT A "MERE CONTINUATION" OF NATIONWIDE?

We next determine whether the district court erred in finding Wells Fargo failed to prove that any exception applied to the general rule of successor nonliabilty. The mere continuation exception provides that when the purchasing corporation is merely a continuation of the selling corporation, it is liable for the debts of the selling corporation. This exception reinforces the policy of protecting the right of a creditor of an indebted corporation to recover from a successor corporation where the successor is substantially the same as the indebted corporation. *Crane*, 114 F. Supp. 2d at 1119.

The elements of the mere continuation exception are:

"(1) transfer of corporate assets (2) for less than adequate consideration (3) to another corporation which continued the business operation of the transferor (4) when both corporations had at least one common officer or director who was in fact instrumental in the transfer . . . and (5) the transfer rendered the transferor incapable of paying its

13

creditors' claims because it was dissolved in either fact or law." *Stratton*, 9 Kan. App. 2d at 266 (quoting *Jackson v. Diamond T. Trucking Co.*, 100 N.J. Super. 186, 196, 241 A.2d 471 (1968).

Our cases have also considered the following additional factors: (6) whether the transferee company held itself out to others as a continuation of the transferor, and (7) whether the transferee company assumed or paid liabilities ordinarily necessary for the uninterrupted continuation of the transferor's business. See *Stratton*, 9 Kan. App. 2d at 255-56. The district court applied these seven factors and the parties tacitly agree, as do we, that they govern our determination.

No one element is necessarily decisive, nor must all the elements necessarily exist for the mere continuation exception to apply. *Stratton*, 9 Kan. App. 2d 254, at Syl. ¶ 7. In this regard, Kansas is unlike other states which place the greatest emphasis on one element or require another. See, e.g., *Katzir's Floor & Home Design v. M-MLS.com*, 394 F.3d 1143, 1150 (9th Cir. 2004) (holding that "inadequate consideration is an 'essential ingredient' to a finding that one entity is a mere continuation of another."); *Ed Peters Jewelry*, 51 F. Supp. 2d at 95 (finding "Plaintiff has failed to carry its burden of demonstrating inadequate consideration, and with this failure, the cause of action for successor liability based on 'mere continuation' dies on the vine."); *Crutchfield v. Marine Power Engine Co.*, 209 P.3d 295, 301 n.16 (Okla. 2009) (citing cases, "[i]n many states that employ the mere continuation exception, the common identity of directors, officers, and shareholders is the most important factor.").

The district court determined that three of the seven factors favored Wells Fargo, three of the factors favored Studentreasures, and the first factor—a transfer of corporate assets—favored neither party. It then found the mere continuation exception did not apply. We review the factors below, realizing that the mere continuation theory requires a common-sense analysis "of corporate realities, not mechanical application of a multi-

14

factor test." *North Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 654 (7th Cir. 1998) *overruled on other grounds by Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 986 n.1 (7th Cir. 2010). We recognize that the test for mere continuity has "a common-sense flavor about it," *HRW Systems, Inc. v. Washington Gas Light Co.*, 823 F. Supp. 318, 330 (D. Md. 1993), and agree we should be careful not to "'elevate form over substance'" in deciding successor liability, *Kaiser Foundation Health Plan v. Clary & Moore*, 123 F.3d 201, 205 (4th Cir. 1997).

## (1) *Did a transfer of corporate assets occur?*

The district found this factor to be inherent—there must be a transfer or no other factors would be reached. It is undisputed that Nationwide transferred its assets to Studentreasures by a UCC Article 9 sale. We agree that the first factor is met and is neutral.

## (2) *Did the transferee provide adequate consideration?*

Studentreasures acquired Nationwide's assets at a UCC Article 9 sale by credit-bidding its $2.5 million Note. The district court ruled that Wells Fargo failed to prove that $2.5 million was not adequate compensation. Wells Fargo contends that its evidence showed Nationwide's value to be as high as $9.5 million. It challenges the correctness of the accounting assumptions and methods used to support the $2.5 million figure and argues that the district court should have applied the KUFTA concept of "reasonably equivalent value." K.S.A. 33-203(b).

Adequacy of consideration presents an issue for the fact-finder. See *Nisenzon v. Sadowski,* 689 A.2d 1037, 1042-43 (R.I. 1997) (finding under Rhode Island fraud conveyance statute, adequacy of consideration is for fact-finder, and reviewable only for clear error); see *Pacific Gas & Elec. Co. v. Hacienda Mobile Home Park*, 45 Cal. App.

3d 519, 530, 119 Cal. Rptr. 559 (1975) ("Adequacy of consideration is a question of fact to be determined by the trier of fact."); *Gaudio v. Gaudio*, 23 Conn. App. 287, 303, 580 A.2d 1212 (1990) ("[T]he adequacy of the consideration in an action to set aside a fraudulent conveyance is an issue of fact.").

Our role is not to reweigh the evidence or make credibility determinations. When a litigant claims the factual findings of a judge or jury are based on insufficient evidence, "this court's power begins and ends with a determination of whether there is evidence to support those findings. If the evidence supports the jury's findings, this court will not disturb them on appeal. It is of no consequence that contrary evidence might have supported different findings." *Unruh v. Purina Mills*, 289 Kan. 1185, 1196, 221 P.3d 1130 (2009); see *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, 736, 159 P.3d 1035 (2007).

Our cases do not reflect any mathematical rules to determine the adequacy of consideration. Instead, all the facts and circumstances of each case must be considered. See *Textron Financial Corp. v. Kruger*, 545 N.W.2d 880, 883-84 (Iowa Ct. App. 1996).

The district court relied on the following evidence of value to determine that $2.5 million was adequate compensation:

- the draft audited financial statements of Studentreasures showed its assets as $2.5 million on the date of acquisition;
- a valuation done by one of the principals of Brass Ring, in connection with its proposal to restructure its ownership, which showed a value of $2.5 million based on an EBITDA value of $500,000 and a standard valuation multiplier of 5;
- the offer from Blackstreet Capital to purchase C3's Note—which had a principal balance of $2.5 million—for $2.5 million plus 2.5% equity in Studentreasures;

16

- the informal proposal by Arch Equity to invest $2.5-3.0 million into Nationwide, including paying down the C3 Note to $1.5 million; and
- the sale price at the UCC sale, which the court stated was a non-collusive sale.

We agree that the first of these—Studentreasures' draft audited financial statements showing its assets as $2.5 million on the date of acquisition—merely reflects the sales price for the transaction and may add nothing to the determination. We find, however, no similar inadequacy in the remaining evidence the district court relied on. Although we may not have reached the same conclusion had we been the trier of fact, we find the record provides sufficient evidence from which a rational fact-finder could conclude that $2.5 million was adequate compensation for the sale. This factor cuts against imposing successor liability, as the district court found.

### (3) *Did the transferee continue the business operations of the transferor company?*

The district court correctly stated this test as whether "[t]he transferee company continued to operate the same business as the transferor producing and selling the same products in the same facilities, with the same employees and the same customers," citing *Stratton*, 9 Kan. App. 2d at 265, and others. The court found it undisputed that Studentreasures sold the same products, occupied the same building, employed 38 of Nationwide's 40 full-time employees, sold to the same customers, and purchased from the same vendors. That finding is supported by the evidence.

But the district court improperly applied this test by concluding that Studentreasures did not continue the business operations because it did not print and bind the books in-house, as Nationwide had. The district court narrowly construed the verb "producing" to mean only "manufacturing." It determined the two companies had a

17

different business model because Studentreasures outsources all of its physical production, and found that fact alone sufficient to make it dissimilar from Nationwide Learning.

Studentreasures argues that the distinction between manufacturing and marketing a product and merely marketing a product is sufficient, citing *R. J. Enstrom Corp. v. Interceptor Corp.*, 555 F.2d 277 (10th Cir. 1977). But that case was not based on Kansas law. And there, the district court's finding of no mere continuation was not based on any manufacturing/marketing distinction but was because the two companies sold different products, had different locations, had different employees, and presumably had different customers. *Enstrom* thus bears little resemblance to the facts here.

Kansas cases show that the narrow interpretation urged by Studentreasures and adopted by the district court is legally incorrect and that the focus must be broader. See, e.g., *Stratton*, 9 Kan. App. 2d at 265 (finding this factor met where the same employees continued the same business of constructing grain elevators from the same office); *Moore*, 1993 WL 513834, at *5 (affirming successor liability under Kansas law where evidence showed the purchasing entity "entered into the same general type of business" as the former entity). Although a narrower view of the nature of the business might be appropriate in a products liability case, *Gladstone v. Stuart Cinemas, Inc*., 178 Vt. 104, 115, 878 A.2d 214 (2005), this is not such a case.

Studentreasures operated the same business as Nationwide, producing the same product although in a different manner, selling the same products, in the same facilities, with the same employees, and to the same customers. This factor favors successor liability.

18

(4) *Did both companies have at least one common officer or director who was instrumental in the transfer?*

The district court found that this factor did not favor either party because "[n]aturally, there will be overlap in management when one company takes over a [predecessor] company that is similar in operations and products." As to common directors, the district court stated, "it is not uncommon that one or more members of the new board of directors would be the same as the previous board." The district court also recognized the commonality of some owners. Nonetheless, the district court found this factor favored Studentreasures because not all owners of Nationwide had ownership in Studentreasures, and because C3 Capital's relative ownership changed from 21% of Nationwide to 94% of Studentreasures.

But those conclusions ignore the applicable legal test for this factor—whether both companies had *at least one* common officer *or* director who was instrumental in the transfer. *Stratton*, 9 Kan. App. 2d at 266-67; *Moore*, 1993 WL 513834, at *5 ("*Stratton* requires 'at least one common officer or director' who was intimately involved in the transfer."). Kansas caselaw does not require complete identity of ownership for successor liability, although the lack of *any* common shareholders cuts against successor liability. *Cowan v. Harris Corp.*, No. 80-4134, 1982 WL 602774, at *6-7 (D. Kan. 1982) (unpublished opinion) (finding no continuation of business because the consideration given for the assets was not inadequate and because there were no common officers or directors). We know of no cases in Kansas or elsewhere that apply the strict rule the district court did here. We agree that absolute identity of ownership between two companies is not necessary for the mere continuation doctrine for successor liability to apply. See *Dixon Lumber Co., Inc. v. Austinville Limestone Co., Inc.*, 256 F. Supp. 3d 658, 675 (W.D. Va. 2017); see, e.g., *Glynwed*, 869 F. Supp. at 277 ("Continuity of ownership, not uniformity, is the test."). The district court thus made an error of law.

19

The record shows that two voting members of Nationwide's board of directors became members of Studentreasures' board of directors: Steve Swartzman of C3 and Tim Keane. We focus our analysis on Swartzman. Studentreasures argues that Swartzman was not instrumental in the transfer because he resigned from Nationwide's board two weeks before the June 30, 2015 due date of C3's Note. But the facts are more complex than that. Swartzman took several significant actions *before* resigning. For example, on May 7—almost six weeks before resigning— Swartzman emailed Poland and others suggesting the possibility of foreclosing C3's Note and acquiring Nationwide's assets "to save the future lease expense." On May 27, Enterprise Bank sent a loan commitment to Swartzman and Poland identifying the borrower as "Nationwide Learning, LLC or a new 'to be formed' entity that will own assets of Nationwide Learning, LLC." In his June 22 email responding to Enterprise Bank, Swartzman set out a scenario of C3 foreclosing on its Note, winning the foreclosure auction, and "reconstitut[ing] the business in a new entity." He stated, "All of the terms in your commitment letter are acceptable to C3, but whether the existing company or a new one signs remain[s] an open question." In fact, C3 had already incorporated Studentreasures Acquisition, LLC for the purpose of acquiring Nationwide's assets. The facts establish that on or about the date that Swartzman resigned from Nationwide—two weeks before the due date on its Note—C3, through Swartzman, incorporated Studentreasures for the purpose of acquiring Nationwide's assets.

Swartzman was instrumental in planning and carrying out the transfer of assets by a foreclosure and auction. That Swartzman resigned from Nationwide's board two weeks before the due date of C3's Note is not controlling, given the acts he set in motion before he resigned.

The district court also found the change in percentage ownership to be significant. C3 Capital's relative ownership changed from 21% of Nationwide to 94% of Studentreasures. Studentreasures relies on *Celestica v. Communications Acquisitions*, 168

20

N.H. 276, 284, 126 A.3d 835 (2015), where the finding of no successor liability was based, in part, on the fact that the two owners who together owned 100% of the new company's shares had each owned less than 25% of the old company's shares. Studentreasures argues that C3 likewise went from being a minority shareholder to owning 94% of Studentreasures.

*Celestica* is not persuasive. It applied the de facto merger exception and not the mere continuation exception, and found "'the factor that usually tips the scales in favor of finding a merger is continuity of ownership, usually taking the form of an exchange of stock for assets.' [Citation omitted.]" 168 N.H. at 281. That type of exchange would require identity or near-identity of owners and percentages. And here, at least one reason that the prior owners did not become owners of Studentreasures is because the form of C3's ownership—a secured interest—allowed it to extinguish the value of all of the other owners' interests. Brass Ring has no ownership interest in Studentreasures because Brass Ring's equity interest in Nationwide (along with its $2.875 million equity investment) was completely wiped out in the foreclosure. Had the sale significantly reduced, instead of significantly increased, C3's percentage of ownership, its argument against successor liability would be more persuasive. The district court applied an erroneous legal test which directed its conclusion that this factor favored neither party. This factor favors imposing successor liability.

> (5) *Did the transfer render the transferor incapable of paying its creditors?*

This factor is easily met. After C3 foreclosed on its Note, Nationwide had no assets, no employees, and no place of business. It had no assets with which to pay its lease obligations of $1.7 million or more to Wells Fargo. Substantial evidence supports the district court's finding that this factor favors imposing successor liability.

21

(6) *Did the transferee hold itself out as a continuation of the transferor company?*

The district court concluded that "[b]y all appearances to the outside world and [to] its customers, the companies are indistinguishable" and found this factor weighed in Wells Fargo's favor. Studentreasures uses the same brand name and trademark, same telephone numbers, same facsimile numbers, and the same Internet website as did Nationwide. Chad Zimmerman, the president and CEO of both companies, agreed in his testimony that it was "critical to maintain continuity with our customers [that we acquired in the] foreclosure, . . . [we] didn't want to confuse the customers." Substantial evidence supports the district court's finding that this factor favors imposing successor liability.

(7) *Did the transferee assume or pay any of the debts of the transferor company?*

The district court ruled that this factor was met and favors successor liability. The parties do not challenge this ruling, and the facts are compelling. Studentreasures paid over $1 million of Nationwide's vendor accounts payable. Specifically, the district court found that Studentreasures paid off $787,501 of Nationwide's past due accounts to 47 "'critical vendors'" Studentreasures considered necessary "'to support the brand and assets that had been acquired.'" In addition to these critical vendors, Studentreasures paid an additional $250,000 to the in-school book vendor Scholastic that was "integral to its continued business operations." Substantial evidence supports the district court's finding that this factor favors imposing successor liability.

22

*Conclusion*

Determining the weight to give to the various factors is the role of the district court when the factors are properly found. But here, errors of law caused the district court to find that the third and fourth factors, above, cut against imposing successor liability. Properly viewed, only one factor—adequacy of consideration—weighs against imposing successor liability.

In *Avery*, our Supreme Court imposed successor liability even though it found a valid business purpose for the transfer because the effect was to eliminate the assets of the original company that would have been used to satisfy a claim for damages by an injured passenger. The court found that the companies' main concern was to get rid of a situation in which the selling company had lost standing to renew its business license. 148 Kan. at 325. Even though that purpose was not actually fraudulent, and the transfer of assets was "the most practical way" to achieve it, the transfer worked a fraud on an injured passenger because it left her with no way to collect damages.

> "Sometimes this sort of conduct on the part of corporations whereby one acquires all the assets of another is characterized as fraudulent. But it may not be intentionally so; perhaps no intentional fraud inhered in this transfer. But where the transfer of assets strips a debtor corporation of all its assets, and disables the corporation from earning money to pay its debts, thus leaving creditors and holders of claims no resources to which they may look for the payment of their due, the net result is in legal effect a fraud; and the courts will subject the transferee to liability for the satisfaction of claims against the corporation whose assets it has absorbed." *Avery*, 148 Kan. at 324.

Such is the case here.

The public policy underlying the imposition of successor liability is the fair remuneration of innocent corporate creditors. See *Cargill v. Beaver Coal & Oil Co.*, 424

Mass. 356, 362, 676 N.E.2d 815 (1997). The whole purpose of imposing liability on a successor corporation or business "is to protect third parties, either creditors or tort claimants, from being left without recourse when a corporation or partnership either sells all its assets or changes the form in which it does business." See *Canadyne-Georgia Corp. v. Cleveland*, 72 F. Supp. 2d 1373, 1381 (M.D. Ga. 1999). That policy is well served here by imposing liability on Studentreasures. As *Avery* noted, Kansas decisions tend to disregard the theory of a corporation as an entity separate from its incorporators where justice requires it. *Avery*, 148 Kan. at 326. We are compelled to reverse the district court on this issue. Studentreasures is a mere continuation of Nationwide, warranting imposition of successor liability.

## C. DID THE DISTRICT COURT ABUSE ITS DISCRETION IN RULING THAT THE FRAUDULENT AVOIDANCE OF DEBT EXCEPTION DID NOT APPLY?

Wells Fargo contends that the district court erred in not applying the fraudulent avoidance of debt exception to the general rule of successor non-liability. Under the "avoidance of debt" exception, a transferee company must pay the debts of a transferor company "where the transaction is entered into fraudulently in order to escape liability for [the transferor's] debts." *Comstock*, 209 Kan. at 310.

Studentreasures argues that this exception cannot apply unless Wells Fargo proved actual fraud, by clear and convincing evidence, citing *Villaverde v. IP Acquisition VIII, LLC*, 39 N.E. 3d 144, 151 (Ill. App. Ct. 2015) (applying the "badges of fraud" provisions from the Uniform Fraudulent Transfer Act (UFTA) to common law successor liability claims). Well Fargo does not dispute that assertion, and cases from other jurisdictions seem to support that interpretation of this exception. See, e.g., *Joseph P. Manning Co. v. Shinopoulos,* 317 Mass. 97, 99, 56 N.E.2d 869 (1944) (applying uniform fraudulent conveyance law) ("[A]t common law, if the conveyance is made and received for the purpose of hindering, delaying or defrauding creditors it is fraudulent and can be set aside

24

without regard to the nature or amount of consideration."); *Eagle Pacific v. Christensen Motor Yacht*, 85 Wash. App. 695, 707, 934 P.2d 715 (1997), *aff'd and remanded*, 135 Wash. 2d 894, 959 P.2d 1052 (1998) (noting that, besides the separate "mere continuation" theory, "[s]uccessor liability may also be imposed where the transfer of assets is for the fraudulent purpose of escaping liability.").

Our caselaw does not state whether fraud, for purposes of this exception, must be actual fraud shown by clear and convincing evidence. *Avery* found successor liability without proof of "intentional fraud." 148 Kan. at 324. But it is unclear whether *Avery* was applying the fraud exception, as it did not reference any exception specifically and spoke only in general terms. *Avery* found successor liability even though "perhaps no intentional fraud inhered in [the] transfer." 148 Kan. at 321. It explained, without reference to the clear and convincing standard of proof, that a transfer of assets may work "in legal effect a fraud" even where the conduct was not intentionally fraudulent. 148 Kan. at 324. This occurs "where the transfer of assets strips a debtor corporation of all its assets, and disables the corporation from earning money to pay its debts, thus leaving creditors and holders of claims no resources to which they may look for the payment of their due." 148 Kan. at 324. But those factors relate to the mere continuation exception addressed above, and the court's comments appear to describe constructive fraud, which underlies the mere continuation exception.

We agree that to apply the fraudulent avoidance of debt exception, Wells Fargo must prove actual fraud, by clear and convincing evidence. If constructive fraud sufficed, this exception would be an unnecessary subset of the mere continuation exception.

Our caselaw gives no guidance on how to apply this exception. Approaches vary in other jurisdictions:

"As with the other exceptions, courts apply different variations of this exception. Some courts review the facts for evidence of fraud without applying a specific test or list of elements. Other courts identify elements that may be 'indicia' of fraud such as inadequate consideration and/or lack of good faith. In some jurisdictions, the courts will apply the elements of the Uniform Fraudulent Conveyance Act or state law versions in assessing successor liability." 1 Handling Business Tort Cases § 8:8 (2016).

Our state law version of the UFTA provides that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor." K.S.A. 33-204(a)(1). It then lists 11 factors to apply "[i]n determining actual intent" under that subsection. K.S.A. 33-204(b). We see no reason those same factors would not be relevant in determining whether to apply the fraudulent avoidance of debt exception to the successor liability rule as well.

In determining whether to apply the fraud exception, the district court did not identify any element that may be an "indicia" of fraud, nor did it apply any elements of KUFTA. Instead, it found evidence of Studentreasures' valid business purpose to be determinative. It found that Nationwide was a dying business in financial peril that could not get credit to fund its next year's operations, and that the primary reason for the foreclosure sale was that it was "the best path forward and perhaps the only means to remain viable." It concluded that the purpose of the foreclosure sale was not to wipe out the equipment lease obligations.

Wells Fargo raises no claim of legal error here. Instead, it contends that direct evidence shows that Studentreasures entered into the asset transfer for the purpose of ridding the business of all indebtedness to entities not essential to its future viability. We have summarized much of that evidence above, relating to Swartzman's acts and Poland's statements.

26

Wells Fargo also alleges the second foreclosure sale shows fraudulent purpose. In 2011, two of Nationwide's officers purchased Class B ownership units in that company and signed promissory notes payable to Nationwide for the purchase price. A few months after the Article 9 foreclosure sale of Nationwide to Studentreasures, C3 conducted a second foreclosure sale and credit-bid another $194,000 to purchase those notes in the name of Studentreasures. Poland testified that the notes were not needed for Studentreasures' business, and that the only purpose in foreclosing on them was to prevent any of Nationwide's unpaid creditors from being able to execute against the notes and collect from the officers. Wells Fargo was such a creditor. We agree that the evidence may show that C3's primary purpose in the transfer was to avoid paying Wells Fargo and the other equipment lessors.

But the district court heard all of that evidence and much more over the course of the 10-day trial. It weighed the credibility of the witnesses, listened to the competing evidence, considered the alternate purposes for which Studentreasures may have entered the foreclosure sale conducted by C3, and found no actual fraud. The district court considered the evidence presented by Wells Fargo showing fraudulent purpose but ultimately chose to believe the testimony of Studentreasures' officers. Nationwide had tried, unsuccessfully, to get more credit, to find new investors, to restructure, and to sell the company. Sufficient evidence supports the district court's finding that the primary purpose was not fraudulent and was instead a valid business purpose. Had we determined the matter in the first instance, our decision may have been different, but we cannot reweigh the facts. A reasonable person could have reached the same result as the district court. We thus find no abuse of discretion in the district court's determination that the fraudulent avoidance of debt exception does not apply, and will not disturb its negative finding. *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 928, 157 P.3d 1109 (2007) (ruling an appellate court will not disturb a negative finding "absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice").

27

DID THE DISTRICT COURT ERR IN FINDING STUDENTREASURES NOT LIABLE UNDER KUFTA?

The district court ruled that Studentreasures did not violate the Kansas Uniform Fraudulent Transfer Act (KUFTA) because it did not have actual intent to hinder, delay, or defraud Wells Fargo, as that statute requires. But first, we must consider whether KUFTA applies at all.

*Did a transfer of assets, as defined by KUFTA, occur?*

Studentreasures argues that KUFTA does not apply because no "assets" were "transferred," as those terms are defined in the statute. We review matters of statutory interpretation de novo because they present questions of law. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). We determine whether the district court's findings of fact are supported by substantial, competent evidence and then apply the correct statutory interpretation to those facts. See *Gannon*, 298 Kan. at 1175-76.

KUFTA provides that "[a] transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor." K.S.A. 33-204(a)(1). A few definitions are important here. KUFTA defines "transfer" as "every mode . . . of disposing of or parting with an asset." K.S.A. 33-201(l). KUFTA defines an "asset" as "property of a debtor," but excludes "[p]roperty to the extent it is encumbered by a valid lien." K.S.A. 33-201(b)(l). A lien is defined as a "charge against or an interest in property to secure payment of a debt . . . and includes a security interest created by agreement." K.S.A. 33-201(h).

Property may thus be considered an asset for purposes of successor liability but not be considered an asset under UFTA. See *Bd. of CTY. Com'ns v. Sportsmen's Ranch*, 271 P.3d 562, 571-73 (Colo. App. 2011) (finding ranch transferred to new LLP in a

28

foreclosure sale was not an asset under the Colorado UFTA, but the ranch was an asset for purposes of successor liability even though it lacked equity); *Ed Peters Jewelry*, 124 F.3d 252. Such is the case here.

Studentreasures persuasively argues that the value of its Note exceeded the value of Nationwide's assets so no "asset" was transferred, citing *Ed Peters Jewelry.* That case reveals, under a similar statutory scheme, that where a purchasing company forecloses on a valid security interest in all the selling company's assets, the selling company's property does not constitute an asset under the UFTA, absent proof to the contrary:

> "As Fleet unquestionably held a valid security interest in all Anson assets, and Peters did not establish that their fair value exceeded the amount due Fleet under its security agreement . . . the Anson property . . . did not constitute an 'asset' and no cognizable 'transfer' occurred." *Ed Peters Jewelry*, 124 F.3d at 262.

This approach is consistently reflected in other cases we have found examining this issue. See *In re Valente*, 360 F.3d 256, 260 (1st Cir. 2004) (finding under Rhode Island's version of the UFTA, property worth $150,000 but encumbered by a $168,000 first mortgage "did not qualify as an 'asset' . . . at the time of the transfer"); *Epperson v. Entertainment Express, Inc.,* 338 F. Supp. 2d 328, 342 (D. Conn. 2004) (holding property and note encumbered by security interests that exceeded their value were not assets under Connecticut's Uniform Fraudulent Transfer Act), *aff'd,* 159 Fed. Appx. 249 (2d Cir. 2005); *Farstveet v. Rudolph*, 630 N.W.2d 24, 34 (N.D. 2001) (noting "Property which is encumbered by valid liens exceeding the value of the property is not an asset . . . and is not subject to a fraudulent transfer."); *Sportsmen's Ranch,* 271 P.3d at 571.

Wells Fargo acknowledges that C3 had a valid security interest in all of Nationwide's assets and that the value of C3's Note and accrued interest exceeded $3 million. But it contends that the Note did not fully encumber the assets because the value

of the assets exceeded $3 million. The district court heard conflicting evidence about the value of Nationwide at the time of foreclosure and found that the $2.5 million bid was adequate compensation, as discussed above. We found above that substantial evidence supports that finding. C3 thus held a valid security interest in all of Nationwide's assets, and Wells Fargo failed to establish that the company's fair value exceeded the amount due under its security agreement. As a result, Nationwide's property did not constitute an asset under KUFTA. K.S.A. 33-201(b)(l). Studentreasures thus cannot be liable under KUFTA.

## DID THE DISTRICT COURT ERR IN DENYING WELLS FARGO'S CLAIM FOR PUNITIVE DAMAGES?

Wells Fargo sought punitive damages based on its successor liability theories and on its KUFTA claim. The district court ruled against it on all claims so denied punitive damages. Generally, we review a decision to allow or disallow a claim for punitive damages for an abuse of discretion. *McElhaney v. Thomas*, 307 Kan. 45, 57, 405 P.3d 1214 (2017). We apply that standard here.

We assume, without deciding, that punitive damages may be imposed in a successor liability case in Kansas. See *Capitol Fed'l Savings & Loan Ass'n v. Hohman*, 235 Kan. 815, 816-17, 682 P.2d 1309 (1984) (finding equitable relief was the substantial equivalent of actual damages); *Golconda Screw, Inc. v. West Bottoms Ltd.*, 20 Kan. App. 2d 1002, 1008, 894 P.2d 260 (1995) ("[P]unitive damages may be awarded incident to equitable relief without an award of actual damages.");

Finding Studentreasures liable through the mere continuation exception is comparable to a finding of constructive fraud. See *Avery*, 148 Kan. at 324 ("the net effect is in legal effect a fraud"). "Constructive fraud is a breach of a legal or equitable duty which, irrespective of the moral guilt, the law declares fraudulent because of its tendency

30

to deceive others or violate a confidence, and neither actual dishonesty of purpose or intent to deceive is necessary." *Andres v. Claassen*, 238 Kan. 732, 741-42, 714 P.2d 963 (1986) (affirming denial of punitive damages where district court found constructive fraud but made no findings on whether the defendant had an intent to deceive the plaintiffs). A finding of constructive fraud does not compel an award of punitive damages. 238 Kan. at 742.

Here, the district court's decision not to award punitive damages was fact-based. It found that even if Wells Fargo had prevailed on its successor liability claim, the court lacked sufficient evidence to award punitive damages because Wells Fargo "did not establish by clear and convincing evidence that Studentreasures acted maliciously, vindictively, willfully or wantonly as to the rights of Wells Fargo." See K.S.A. 60-3702(c) (providing that the plaintiff has the burden of proving, by clear and convincing evidence, that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud, or malice). Having reviewed the evidence, we find no abuse of discretion in the district court's decision to deny punitive damages.

CONCLUSION

We reverse the district court's finding that Wells Fargo failed to prove the mere continuation exception applies and remand for entry of judgment in favor of Wells Fargo and against Studentreasures on Count Two (successor liability) in the amount of $492,836.40, plus interest. We affirm in all other respects.